Grady Paul **CHESTNUT**, Appellant,

v.

**FORD MOTOR COMPANY**, Appellee.

No. 14844.

United States Court of Appeals,
Fourth Circuit.

Argued March 4, 1971.

Decided July 13, 1971.

Emanuel Emroch, Richmond, Va. (Emroch, Cowan & Kauffman, and Frank N. Cowan, and Herman Abady, Richmond, Va., on brief), for appellant.

Aubrey R. Bowles, III, Richmond, Va. (Aubrey R. Bowles, Jr., and Bowles & Boyd, Richmond, Va., on brief), for appellee.

Before BOREMAN, BRYAN, and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

This is a products liability case involving a 1967 Mercury Cougar automobile manufactured by the Ford Motor Company. The plaintiff, Grady Paul Chestnut, is a 28-year-old career soldier who purchased the car, while home on leave from Vietnam, from the Daniel Motor Company in Craigsville, Virginia, a few hours prior to noon on August 12, 1967. At approximately 1 a. m. on August 13, 1967, less than 24 hours after the purchase, Chestnut was driving his new car on a mountain road five or six miles from his parents' home in Neola, West Virginia. The automobile left the road and crashed into a ravine. As a result of the accident, Grady Chestnut was paralyzed from the neck down. Louise Rider, the only other passenger in the automobile at the time of the accident, also received injuries.

Chestnut filed a complaint in the United States District Court for the Eastern District of Virginia charging the Ford Motor Company and the Daniel Motor Company with liability for his injuries. The 1967 Mercury Cougar was equipped with a headlight lid closure system. If the system is operating properly, turning off the headlights at the dashboard causes metal opaque lids to close over the headlights. Turning the headlights on causes the lids to retract allowing light projection. Plaintiff's theory of the cause of the accident is that the system was not operating properly—that the lids closed over the headlights while Grady Chestnut was driving and that he lost control of the automobile in the sudden darkness. The defendant's theory of the accident is that it was caused by driver error.

The complaint was predicated on a number of theories of liability including breach of warranty, negligence in design and manufacture, and strict liability in tort. The Daniel Motor Company was dismissed from the action during the trial on the plaintiff's motion and the action proceeded against the Ford Motor Company. At the close of the testimony, the district court submitted the case to the jury solely on the breach of warranty theory. The jury returned a verdict for Ford Motor Company. From the district court's ensuing judgment for the defendant Grady Chestnut appeals. We find a number of errors of sufficient magnitude to compel us to vacate the judgment and remand for a new trial.

## I.

Plaintiff contends that the district court's refusal to submit the case to the jury on the alternative theories of strict liability in tort and negligence in design was error. We think not.

The standard of safety of goods imposed on the seller or manufacturer of a product is essentially the same whether the theory of liability is labelled warranty or negligence or strict tort liability: the product must not be unreasonably dangerous at the time that it leaves the defendant's possession if employed in the manner in which it was intended to be used or put to a special use known beforehand by the defendant.[1]

---

1. "By and large, the standard of safety of goods is the same under the warranty theory as under the negligence theory. In both actions the plaintiff must show (1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some special use which was brought to the attention of the defendant, and (2) that the unreasonably dangerous condition existed when the goods left the defendant's hands."
2 F. Harper & F. James, The Law of Torts § 28.22, at 1584 (1956). *Compare* Restatement (Second) of Torts § 402A (1965).

The only difference between negligence and strict tort liability is that the plaintiff attempting to prove negligence must prove an additional element, *i. e.*, not only that the product was dangerously defective at the time that it left the defendant's hands, but also that the defect was the result of the defendant's failure to exercise due care. Other than that, the differences between the three rationales of liability consist of varying defenses available to the defendant depending upon whether the theory of the forum is tort or contract: in a tort action, the defendant may raise the defense of contributory negligence; in a contract action, the defendant may raise defenses of lack of privity, lack of notice of the breach, express disclaimer of the warranty, or contractual assumption of risk.[2] None of these defenses were raised by the defendant in this action.

On the facts of this case, the instructions to the jury given by the district court in terms of breach of warranty were functionally equivalent to instructions that might have been given in strict liability terms or in negligence terms. Because the safety standard of the product is the same in all three, only confusion could have resulted from charging the jury with respect to the different theories of liability. Actually, the failure to charge on a negligence theory may have been beneficial to plaintiff for doing so would have required consideration of an extra element: whether the defect spoke for itself to show a failure to exercise due care in manufacture. We think the district court wisely chose one theory only for revelation to the jury and its refusal to

give instructions in terms of negligence and strict tort liability was not error.

## II.

Much of the testimony at the trial centered around plaintiff's attempt to trace the alleged failure of the headlight closure system to a defect in a solenoid coil. A solenoid coil is a spool of wire. When an electrical current is passed through the wire, an electromagnetic field is created. A steel rod is placed in the center of the spool. When the current is turned on, the magnetic field pulls the rod into the center of the spool. When the current is turned off, a spring attached to the rod pulls it away from the center of the spool. The movement of the rod is transferred through a series of other devices to open and close the headlight covers. The important feature of this system for purposes of this case is that the spring attached to the rod will move the rod away from the center of the solenoid if there is any interruption in the electrical current through the solenoid wire, and thus any interruption in the current will cause the lids to close over the headlights.

Each end of the solenoid wire is attached to a metal terminal. A wire from the headlight switch is attached to one of the terminals—the "hot" terminal —thus providing an electrical current when the headlights are turned on. A wire leads from the other terminal—the "ground" terminal—to the frame of the automobile completing the electrical circuit. Plaintiff's experts removed the solenoid unit from the wrecked automobile and discovered that electricity would not pass through the solenoid. X-ray

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if * * * it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

2. *See* F. Harper and F. James, *supra* § 28.32.

> [I]t may fairly be said that the liability which [Section 402A] would impose is hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitation through inconsistencies with express warranties.

Greeno v. Clark Equip. Co., 237 F.Supp. 427, 429 (N.D.Ind.1965).

and subsequent microscopic examination revealed a crack in the "hot" terminal and a partial crack in the "ground" terminal. Plaintiff's experts testified that it was their opinion that both terminals were partially cracked when they were bent in the manufacturing process and that, while Grady Chestnut was driving the automobile, the electricity passing through the solenoid burned through the remaining portion of the "hot" terminal causing the headlight covers to close. The conclusions of plaintiff's experts were, of course, challenged by the conclusions of defendant's expert witnesses.

After the district judge instructed the jury as to the elements of breach of warranty that the plaintiff was required to prove, he made the following statement:

"This is not a difficult case. It is not a technical case in the sense that there are many, many issues. You know where the burden is, as in every case. If you believe that the warranty was breached, that is what caused it, that the electrical system was bad by virtue of this valve [referring to the solenoid coil] when it left that factory, and that the lights went out and caused it, that is it. Don't go outside the evidence to speculate what might have happened. Decide it from the evidence in this case. And if it turns out that you don't accept that, don't believe it is proven by a preponderance

of the evidence, that is the end of it and you find for the defendant."

■ The plaintiff argues on appeal that this portion of the judge's charge to the jury placed on him a burden of proof that he was not required to carry, i. e., proof of the specific nature of the defect. He contends that all he is required to prove is that the product was defective at the time it left the factory, and that the defect was the proximate cause of the accident, and that the jury could have resolved the dispute between the expert witnesses about the defective solenoid coil in Ford's favor and still have properly concluded that the headlight closing mechanism was defective when it left the Ford factory. Plaintiff refers us to a number of cases in support of his position that he was not required to prove a specific defect, i. e., precisely why there was malfunction of the headlights. See e. g., Kridler v. Ford Motor Co., 422 F.2d 1182 (3d Cir. 1970); Franks v. National Dairy Products Corp., 414 F.2d 682 (5th Cir. 1969).

We need not determine whether the applicable state law[3] would require proof of a specific defect since the defendant seems to agree that requiring proof of a specific defect would be improper.[4] Defendant contends, however, that the charge did not require plaintiff to prove a specific defect, that the district judge properly instructed the jury that plaintiff only had to prove the au-

3. Whether the law of Virginia, West Virginia or Michigan is applicable was not considered either in briefs or oral argument.

4. During oral argument, defendant's attorney stated that he had requested an instruction which would have required proof of a specific defect and that the district court's refusal to give that instruction was entirely correct. We find the requested instruction, recited below, virtually indistinguishable from the instruction actually given.

The Court tells you that the plaintiff also claims that the solenoid valve employed in the system to open and close the headlight doors on the 1967 Mercury Cougar automobile was defective

and that such defect caused his injuries. The burden of proof is at all times on the plaintiff to satisfy you by a preponderance of the evidence that the solenoid valve was defective and that such defect caused his injuries. If, on the contrary, you believe from all the evidence that the solenoid was not defective, or even if you believe that it is just as probable that it was not defective as that it was, you still may not find a verdict for the plaintiff against the Ford Motor Company on the ground that the solenoid was defective and that such defect caused his injuries.

Defendant's brief does not take issue with the plaintiff's contention that he is not required to prove the specific defect.

tomobile was defective, and that the quoted portion of the charge is merely a comment on the evidence that the jury was entitled to disregard.

Reading the charge as a whole, we conclude that the jury was limited to consideration of a defect in the solenoid coil. The district judge did not instruct the jury that the quoted portion of the charge was merely a comment on the evidence, or that they were entitled to consider whether the headlight closing lid was defective in operation otherwise than with regard to the solenoid. We think that the quoted portion could only have been considered by the jury as a specific limitation on the more general instructions as to the elements plaintiff was required to prove given earlier in the charge.

Even if construed as limiting, defendant next contends that the charge was not improper because all of the plaintiff's proof was directed at a showing of a defect in the solenoid coil, and that a jury finding of defect other than the alleged defect in the solenoid would be the product of pure speculation. After reviewing the testimony in the record, we conclude that there was ample evidence other than the testimony regarding the solenoid to allow a jury to infer that the headlight closure system was defective. Louise Rider, the passenger in the automobile, testified that Grady Chestnut was driving at a reasonable speed and in a proper manner and that, without touching the light switch on the dashboard, the lights suddenly went out. After examining the automobile, experts for both plaintiff and defendant agreed that the headlights were burning on low-beam at the time of the accident and a stipulation to that effect was entered at the trial. In response to a hypothetical question, one of plaintiff's expert witnesses testified that the only way light projection could be lost if the headlights remained on was for the headlight covers to close over the burning headlights. We think a jury would be entitled to conclude from this testimony that the headlight closure system was defective and to infer from the fact that the automobile was purchased less than 24 hours prior to the accident that the defect was present at the time the automobile left the Ford plant.

We also conclude that there was ample evidence to support a jury determination that the headlight closure system was defectively designed. Two of plaintiff's expert witnesses testified, in effect, that safety engineering begins with the assumption that a system will malfunction. If the result of a malfunction is disastrous, ordinary engineering care requires that the system should be designed to reduce the possibility of a malfunction to an absolute minimum or modified to eliminate the disastrous effect. The solenoid design employed by Ford for the headlight closure system in the 1967 Mercury Cougar is spring-loaded to cause the headlight lids to close over the headlights anytime there is an interruption in the electrical current. Both of plaintiff's experts testified that such a system was unsafe from an engineering standpoint and that an alternative device, more reliable than a solenoid, could have been used to minimize the possibility of malfunction or that the automobiles could have been equipped with mechanical locks to prevent closure during a malfunction.

### III.

During the voir dire examination of the prospective jurors, one of them disclosed he owned 100 shares of capital stock in the defendant, Ford Motor Company. Plaintiff challenged this prospective juror for cause, but the district judge refused to strike him from the panel. Plaintiff used one of his peremptory strikes to remove the Ford stockholder.

That a stockholder in a company which is a party to a lawsuit is incompetent to sit as juror is so well settled as to be black letter law. See 50 C.J.S. Juries § 213 (1947); 47 Am.Jur.2d Jury § 325 (1969). Each party in a civil action is statutorily entitled to three peremptory challenges. 28 U.S.C. §

1870. Plaintiff used all three of his peremptory challenges. The district court's refusal to strike the Ford stockholder for cause effectively reduced the number of challenges given the plaintiff to two and is reversible error.

## IV.

During the trial, the plaintiff testified that he had total amnesia for the period from a few minutes before until five days after the accident. Although the accident occurred at approximately 1 a. m., the wrecked automobile was not discovered until approximately 7 a. m. Grady Chestnut and Louise Rider were both conveyed to the Pocahontas Hospital in Marlinton, West Virginia, where Grady Chestnut was treated by Dr. Rexrode. Dr. Rexrode testified that he asked Grady Chestnut about how the accident happened when he felt Grady Chestnut was conscious enough to respond, approximately 9 p. m. the day of the accident. The plaintiff offered the doctor's testimony that Grady Chestnut told him that "he was coming to the top of a hill meeting a car and he dimmed his lights and they folded in on him." The court excluded the proffered testimony as an inadmissible "self-serving" statement.

The term "self-serving" is a misnomer that ought to be interred. It has long obscured the proper application of the hearsay rule to the reception of evidence, and is not an independent ground of objection. D. Stansbury, North Carolina Law of Evidence § 140 (1963). "[T]he appropriate rule for the exclusion of a party's declarations offered in his own behalf as evidence of the truth of the facts declared is the hearsay rule." C. McCormick, Law of Evidence § 275, at 588 (1954). Whether self-serving, neutral, or disserving, a hearsay statement that does not fit within one of the exceptions to the hearsay rule is inadmissible, and the reverse is true. See, e. g., Southern Passenger Motor Lines, Inc. v. Burks, 187 Va. 53, 46 S.E.2d 26 (1948); Kirby v. Moehlman, 182 Va. 876, 30 S.E.2d 548 (1944).

Because Chestnut's amnesia prevents his describing what occurred at the time of the accident, plaintiff urges upon us that in all fairness his statement should be admitted as an exception to the hearsay rule. Hearsay statements are admissible if they are "uttered under stress of excitement produced by a startling event and made before the declarant has had time or opportunity to reflect or contrive." C. McCormick, supra § 272 at 578.[5]

5. Statements of this type are generally said to be within the "res gestae" exception to the hearsay rule. Like the phrase "self-serving statement" the term "res gestae" should be banished from our vocabulary.

> The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phaseology. No rule of Evidence can be created or applied by the mere muttering of a shibboleth. * * * Even if there was no accepted name for one or another doctrine, any name would be preferable to an empty phrase so encouraging to looseness of thinking and uncertainty of decision.

6. J. Wigmore, Evidence § 1767, at 182 (3d ed. 1940). See also C. McCormick, supra § 274.

For purposes of convenience we use here the term employed by Wigmore to describe the rule that has been applied to admit hearsay statements of accident victims, "spontaneous exclamation." But we recognize that the modern trend is to ignore labels of this type completely and concentrate on the two factors that underlie most exceptions to the hearsay rule: (1) the necessity of accepting hearsay testimony rather than direct testimony subject to cross-examination; (2) the circumstantial probability of trustworthiness of the hearsay statement. See 5 J. Wigmore, supra §§ 1420–23. The most recent draft of the proposed Rules of Evidence for the United States Courts and Magistrates, for example, applies these principles to broaden the typical state spontaneous ex-

■ We think the record insufficiently clear to enable us to decide whether Grady Chestnut's statement to Dr. Rexrode should have been admitted as a spontaneous exclamation or under some other exception to the hearsay rule. The admissibility of such a statement depends on the particular facts of each case. 6 Wigmore, *supra* § 1750, at 144. It is not possible to determine from the record before us whether Grady Chestnut had regained his reflective powers sufficiently to possibly fabricate an account of how the accident happened during the 20-hour period between the accident and his statement to the doctor. There is some testimony in the record that he spoke to a number of individuals during this period, but the record does not indicate whether these were the statements of a rational man or merely the babblings of one in pain and in a state of severe shock. Since this case must be remanded for other reasons, the question can better be decided after a more complete factual inquiry during the new trial.

## IV.

■ Louise Rider provided the only eyewitness testimony as to how the accident occurred. Plaintiff contends that the court should have permitted the introduction of prior consistent statements made to her father and the plaintiff's mother. During the trial, the defendant tried to impeach Louise Rider's testimony by suggesting that she actively sought recovery from Grady Chestnut's insurance company, thus implying that she had earlier maintained that the accident was the product of driver error. Had Louise Rider's prior statements been introduced to rebut this attack on her credibility, plaintiff's contention that these statements should have been

clamation exception where the declarant, as in this case, is unavailable as a witness. Rule 804(b) (2), 51 F.R.D. 315, 438 (1971). *Compare* Rule 803(2), 51 F.R.D. at 419. For a recent decision applying these principles to broaden the traditional rules of admissibility, see State v. Vestal, 9 Crim.L.Rptr. 2204 (N.C. May 12, 1971).

admitted would be well taken. See United States v. Stamey, 423 F.2d 1223 (4th Cir. 1970); United States v. Leggett, 312 F.2d 566, 572 (4th Cir. 1962); Butler v. Parrocha, 186 Va. 426, 43 S.E. 2d 1, 6 (1942); 4 J. Wigmore, Evidence § 1128 (3d ed. 1940).

■ Neither of her statements were so introduced, however. Plaintiff called Louise Rider's father to testify before he called her. During his testimony, plaintiff's attorney asked him to relate the account of the accident given him by his daughter shortly after the event. The district court excluded this testimony as hearsay. Since Louise Rider had not yet testified, her credibility was not under attack, nor had her interest been made to appear,[6] and her father's testimony of a prior consistent statement was inappropriate time-wise.

Grady Chestnut's mother was called to testify after Louise Rider's credibility had come under attack, but plaintiff never attempted to introduce her testimony of any prior consistent statement. Instead she was specifically instructed by plaintiff's attorney not to repeat any statement Louise Rider made to her. Plaintiff cannot complain about not being allowed to introduce evidence that he never attempted to introduce.

## VI.

Plaintiff has raised numerous additional issues in this appeal. Since there must be a new trial, and the problems may not recur, or may recur in a different fact setting, we think no worthwhile purpose would be served by discussion in this opinion. For the reasons stated herein, the judgment must be vacated and the case remanded for a new trial.

Vacated and remanded.

6. A prior consistent statement may be admissible without regard to an impeaching effort if the witness' "relationship to the case is such as to justify an inference of bias * * *." D. Stansbury *supra* § 51.