414 So.2d 1105 (1982)
Ida Jean HARTMAN, Appellant,
v.
OPELIKA MACHINE AND WELDING COMPANY and United States Fidelity and Guaranty Company, Appellees.
No. TT-50.
District Court of Appeal of Florida, First District.
May 28, 1982.
R.P. Warfield and James M. Barton, II, of Levin, Warfield, Middlebrooks, Mabie, Rosenbloum & Magie, Pensacola, for appellant.
Charles C. Sherrill and Larry Hill, of Sherrill, Moore & Hill, Pensacola, for appellees.
*1106 ERVIN, Judge.
In this products liability action, Ida Jean Hartman appeals from a final judgment in favor of appellee, Opelika Machine and Welding Company, the manufacturer of an allegedly defective product which purportedly caused certain personal injuries suffered by her at the Monsanto Textiles Company mill where she worked. Appellant Hartman relies for reversal upon several asserted trial errors, only two of which merit extended discussion: (1) Whether the entry of a directed verdict for appellee on the theory of strict liability was reversible error, and (2) whether it was reversible error for the trial judge to allow Opelika to present evidence of Monsanto's design changes in the spin buggy after the accident. We find the first assigned point requires reversal, but affirm the latter.
Appellant was employed by Monsanto as a drawtwist operator. Her job was to take finished yarn from one drawtwist machine, put the spools of finished yarn onto the arms of a spin buggy, and move on to the next machine. The spin buggy had a rectangular base, and was mounted on four wheels so that it could be rolled by the operator along the plant floor from machine to machine. At each end of the spin buggy's rectangular base were stanchions to which were welded several projecting arms made of aluminum tubing, that served as handles for moving the buggy and to hold the bobbins of yarn. The accident occurred while appellant was walking backwards, pulling at the same time the top arm of the buggy with her right hand, when the arm handle broke off, thereby causing her to fall onto the concrete floor.
Appellant's three-count fifth amended complaint sought recovery on the theories of implied warranty, negligence, and strict liability. Prior to trial, a summary judgment was granted in favor of Opelika on the strict liability count, insofar as any design defect was concerned, upon uncontradicted evidence that the spin buggy was fabricated by Opelika based upon a design and specifications furnished by Monsanto. At trial, after all evidence for plaintiff and defendant had been presented, the trial court directed a verdict for Opelika on the strict liability count, as to any manufacturing defect, and submitted the case to the jury on the counts charging breach of implied warranty and negligence. As to those theories, the jury returned verdicts absolving Opelika from liability.
Although the record before us does not disclose the trial judge's reasons for directing a verdict on the strict liability count at the close of all the evidence, we presume from Opelika's arguments here and in the court below that the trial judge was persuaded by Opelika's "stream of commerce" argument. Opelika maintains that a manufacturer which fabricates and supplies a product solely for the use of a single purchaser, using a design, plans and specifications furnished by the purchaser, is not "engaged in the business of selling such a product" within the meaning and intent of Section 402A, Restatement of Torts (Second). If this were the basis for the court's decision, it was without legal foundation. Opelika was in the business of manufacturing and supplying products such as the spin buggy to independent customers, and we find no authority to suggest that Opelika's liability for a defectively welded part should be determined on different principles than for a manufacturer who places its product on the market for sale to the general public. Section 402 of the Restatement of Law of Torts (Second), defining strict liability, "applies to any manufacturer of ... a product [for use or consumption], to any wholesale or retail dealer or distributor... ." See comment f to Section 402A.
The arguments made by defendant here should be compared with those of the defendant manufacturers in Foster v. Day & Zimmermann, 502 F.2d 867 (8th Cir.1974) and Challoner v. Day & Zimmermann, Inc., 512 F.2d 77 (5th Cir.1975), to the effect that because they assembled certain military products according to the government's specifications and design, and sold the products exclusively to the government, they were not part of the distributive process. *1107 Both courts rejected these arguments, holding that strict liability applies to a situation which is essentially commercial in nature, involving the transmission of the product into the stream of commerce.
Opelika's stronger argument is that notwithstanding the fact that the lower court may have erred in granting the motion for directed verdict on Hartman's strict liability claim, the error was harmless only because the charge given to the jury on implied warranty, being substantially similar to that of strict liability was, in effect, an instruction which was tantamount to strict liability. Opelika relies upon a decision of the Fourth District Court of Appeal, Sansing v. Firestone Tire and Rubber Company, 354 So.2d 895 (Fla. 4th DCA 1978), in which the court held that no error occurred due to the trial court's dismissal of plaintiff's strict liability claim because the charge given the jury on breach of implied warranty closely paralleled that given on strict liability. Had the same or substantially similar charge been given by the court to the jurors in the case below as was given them in Sansing, we would have no difficulty in agreeing that the directed verdict on the strict liability claim was harmless. The trial court's instruction in Sansing was, however, far different from that given here. Compare the charge given below[1] with that given the jury in Sansing.[2]
The Sansing instruction substantially approximates the standard instruction presently provided juries in strict liability actions, to the effect that "[a] product is defective if it is in a condition unreasonably dangerous to the user and the product is expected to and does reach the user without substantial change affecting that condition." See Standard Instruction PL-4.[3] On the other hand, the charge given here was patterned after Standard Instruction PL-2, relating to the implied warranty of merchantability, stating that "[a] product is defective if it is not reasonably fit for the uses intended or reasonably foreseeable by (defendant)."[4] Obviously, then, both the standard instruction on strict liability and the instruction given by the trial court in Sansing on breach of implied warranty of merchantability emphasize  unlike the charge given here  the unreasonably dangerous condition of a product that may cause physical harm to the user. The failure to charge the jury on a product's potential affinity for causing injury is a serious omission. As Professor Wade[5] has observed: *1108 "[A] product may be defective and still not be likely to cause injury. An automobile, for example, may have something wrong with the ignition so that it will not start properly, or the clock or the radio may not work correctly. If so, it is obviously defective, but it is not harmfully defective." Wade, On the Nature of Strict Liability for Products, 44 Miss.L.J. 825, 832 (1973).
Instead of advising the jury that a defendant may be liable for manufacturing a defective product which may be so unreasonably dangerous as to cause physical harm to a human being, the charge given below stresses the contractual relationship between the buyer and the seller, or the idea of a contractual action for failure of the plaintiff to receive what had been contracted for. Indeed, the various remedies afforded the respective parties under Part VII of the UCC relating to sales (2.701-.724) underscore such contractual relationships. As examples, the buyer's remedies include his right to cancel the contract, to recover damages for non-delivery of the goods, to obtain specific performance or replevy the goods, etc., UCC 2.711; yet, only one remedy is permitted him in the event he suffers personal injuries, and it is limited to consequential damages resulting from the seller's breach which are "proximately resulting from any breach of warranty." Section 672.715(2)(b), Florida Statutes (1979) (UCC 2.715(2)(b)). Thus, the reasonable fitness test for determining whether goods are merchantable
was never intended to be a test for ascertaining when a maker would be liable for damages incurred by those who were physically harmed. This is apparent from the fact that the Uniform Commercial Code provides for recovery of damages for physical harm as consequential damages from a breach of warranty and only then if that damage proximately results from the breach of warranty. This means at the very least that physical harm from such unfitness must be reasonably foreseeable... . [T]his is a circuitous route to saying that the product is unreasonably dangerous.
Keeton,[6]Product Liability and the Meaning of Defect, 5 St. Mary's L.J. 30, 37 (1973) (footnotes omitted) (emphasis in original).
An additional problem stemming from the indiscriminate application of the implied warranty standard to a strict liability action is the measure of damages awardable. As we previously observed, one who seeks damages for personal injuries in an action founded on breach of implied warranty may receive them only if they "proximately result ... from any breach of warranty." Section 402A, however, does not limit the recovery of damages to those which are proximately caused by a product's defectiveness, but instead uses the words, "harm thereby caused ...," thus suggesting that it may have been the drafters' intention to require the plaintiff to prove only that the defective product was the factual cause of his injury.[7]
Professor Wade pinpoints another problem in gauging the measure of damages awardable in strict liability cases if a warranty standard is applied.[8] Because damages for personal injuries resulting from breach of warranty are characterized by the UCC as "consequential", such damages might be limited to the rule stated in Hadley v. Baxendale, 9 Ex. 341, 156 Rep. 145 (1854), requiring that damages recoverable for breach of contract be those which are reasonably foreseeable or within the contemplation of the parties at the time they entered into the contract. If such a limitation were imposed upon a claim brought under strict liability, another paradox emerges: although strict liability is founded on tort, see comment m to Section 402A, *1109 tort principles would necessarily be disregarded in determining the measure of damages in strict liability. The anomalous result would be that a claimant's recovery in strict liability would ordinarily be far less than that allowable if the action were founded upon negligence,[9] an action which strict liability was designed to supersede.
There can be little doubt that the scope of strict liability is far more extensive than a claim based on implied warranty. In fact, one of the reasons West v. Caterpillar Tractor Co., Inc., 336 So.2d 80, 90 (Fla. 1976) gave for its adoption of Section 402A was that "warranty law in Florida has become filled with inconsistencies and misapplications in the judiciary's attempt to provide justice to the injured consumer, user, employee, bystander, etc., while still maintaining the contractual principles of privity." The creation of Section 402A was no doubt in part motivated by the drafters' efforts to correct such judicial "misapplications" and "inconsistencies." Indeed, comment m to Section 402A states:
A number of courts, seeking a theoretical basis for the liability, have resorted to a "warranty," either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. In some instances this theory has proved to be an unfortunate one. Although warranty was in its origin a matter of tort liability, and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. There is nothing in this Section which would prevent any court from treating the rule stated as a matter of "warranty" to the user or consumer. But if this is done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.
* * * * * *
The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, "warranty" must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort.
Restatement of Law of Torts (Second), 355-56.
Thus, as the above comments indicate, the standard for product defectiveness in warranty actions is not wholly applicable to claims grounded upon strict liability. Until the lines of demarcation are clearly drawn, we are reluctant to state that the standard charge pertinent to an action for breach of implied warranty, stressing as it does a plaintiff's loss of bargain, coextends with the standard charge presently required for strict liability. And, because the instruction *1110 as given below failed to suggest to the jury the alleged offending product's potential for causing physical harm to the user, it was, in our judgment, an incomplete and misleading instruction, the effect of which was reversible error. Cf. Escambia County Electric Light & Power Co. v. Sutherland, 61 Fla. 167, 55 So. 83 (1911); Adkins v. Seaboard Coastline R.R. Co., 351 So.2d 1088 (Fla.2d DCA 1977).
In her second point, appellant urges that it was error to allow defendant to produce evidence showing Monsanto's post-accident design changes to the buggy consisting of substitution of steel bars for the hollow aluminum tubing arms, and the welding of a bracket to each arm where it joined the stanchion. Appellant bases this point upon the well-settled general rule, followed in Florida, that evidence of a change in condition or repairs made after an injury-causing accident is not admissible as proof of the defendant's negligence in failing to make the repairs or changes prior to the accident. City of Miami Beach v. Wolfe, 83 So.2d 774 (Fla. 1955); City of Niceville v. Hardy, 160 So.2d 535 (Fla. 1st DCA 1964), and see Section 90.407, Florida Statutes (Supp. 1980), "Subsequent remedial measures." There are only two recognized exceptions to the general rule in Florida pertinent to the issue before us: First, inquiry as to subsequent repairs is permissible on cross-examination to test credibility. Wilson & Toomer Fertilizer v. Lee, 90 Fla. 632, 106 So. 462 (1925). Second, evidence of subsequent repairs can be used in rebuttal if the opposing party "opens the door." Hethcoat v. Chevron Oil Co., 383 So.2d 931 (Fla. 1st DCA 1980).
We have found no cases in Florida involving the precise factual situation to that before us, i.e., where post-accident design changes were made by one not a party to the litigation, and such facts are sought to be admitted into evidence by one or more of the parties. There is, however, impressive out-of-state authority both permitting, see, e.g., Denolf v. Frank L. Jursik Co., 395 Mich. 661, 238 N.W.2d 1 (1976); Lolie v. Ohio Brass Co., 502 F.2d 741 (7th Cir.1974); Steele v. Wiedemann Machine Co., 280 F.2d 380 (3d Cir.1960), and excluding such evidence. See Texas & New Orleans R.R. Co. v. Barnhouse, 293 S.W.2d 261, 266 (Tex.Civ. App. 1956). We prefer the rule of admissibility under the limited circumstances applicable to this case, and adopt the reasons advanced by the Michigan Supreme Court for its reception:
The rule [of exclusion] is defended in terms of relevancy and policy. Such evidence is said to be irrelevant because it is capable of explanations equally as plausible as an admission by conduct of pre-accident neglect of duty. If relevancy were the only criteria, Professors Wigmore and McCormick both point out that such evidence would meet the usual standards of relevancy. The rule is primarily grounded in the policy that owners would be discouraged from attempting repairs that might prevent future injury if they feared that evidence of such acts could be introduced against them. This policy consideration is absent in a case, such as this, where imposition of liability is not sought against the person taking the remedial action.
(238 N.W.2d at 4) (footnotes omitted).
In view of our ruling upholding the admission of such evidence when the change is made by one not a party to the action, we find it unnecessary to address appellee's contention that the general rule excluding evidence of post-accident remedial action is inapplicable in products liability litigation. See, on this issue, Barry v. Manglass, 55 A.D.2d 1, 389 N.Y.S.2d 870 (App.Div., 1976); Ault v. International Harvester Co., 13 Cal.3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148 (Cal. 1974); and Sutkowski v. Universal Marion Corp., 5 Ill. App.3d 313, 281 N.E.2d 749 (Ill.3d DCA 1972); contra, Cann v. Ford Motor Co., 658 F.2d 54 (2d Cir.1981), holding that the rule of exclusion applies in strict liability actions as well as negligence actions, and noting the split in jurisdictions.
Finally, we have considered and affirm the trial court's rulings as to appellant's two remaining points, one asserting error in allowing defense witness Lamar to *1111 testify concerning the design of the spin buggy, the other claiming error in permitting expert witness Johnson to testify. The trial judge is accorded considerable leeway in ruling on the admissibility of evidence and the qualifications of an expert witness. See Whitten v. Erny, 152 So.2d 510 (Fla.2d DCA 1963); Seaboard Air Line R.C. v. Lake Region Packing Association, 211 So.2d 25 (Fla. 4th DCA 1968); Headley v. Lasseter, 147 So.2d 154 (Fla.3d DCA 1962); Vitale Fireworks Manufacturing Company v. Marini, 314 So.2d 176 (Fla. 1st DCA 1975); Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975). And we do not find on this record such an abuse of discretion warranting reversal.
Reversed in part and affirmed in part, and remanded for further proceedings consistent with this opinion.
SHIVERS, J., concurs.
LARRY G. SMITH, J., concurring in part and dissenting.
LARRY G. SMITH, Judge, concurring in part, and dissenting.
I disagree with that portion of the majority's opinion dealing with the trial court's error in directing a verdict for defendant and failing to instruct the jury on the strict liability count, and I would affirm on this point under the harmless error rule. I concur in the decision and the discussion of the other points.
I agree with the majority that the trial court was in error in directing a verdict on the strict liability count. As indicated by the majority, the trial judge gave no reasons for this ruling, but it is assumed, from Opelika's arguments here and in the court below, that it was based upon Opelika's "stream of commerce" argument. As pointed out by the majority, the foundation for a "stream of commerce" defense is absent here. In fairness, however, since a great deal of argument was devoted to this point both here and in the trial court, it should be pointed out that Opelika's argument would have merit under different facts, as in Garrison v. Rohm, and Haas, 492 F.2d 346 (6th Cir.1974). Although in Garrison, as in this case, the manufacturer did not design the product, the plaintiff's expert in Garrison admitted there was no defect in workmanship or materials in the allegedly defective dolly that was the subject of the law suit. Thus, Garrison is clearly distinguishable. Our research disclosed several cases in which the "stream of commerce" element was found absent, thereby defeating recovery under a strict liability theory, but none of these cases involved facts similar to those in the case before us. See, e.g. Shook v. Jacuzzi, 59 Cal. App.3d 978, 129 Cal. Rptr. 496 (1976); Streatch v. Associated Container Transp. Ltd., 388 F. Supp. 935 (D.C.Cal. 1975), 29 A.L.R.2d 771; Nastasi v. Hochman, 58 App. Div.2d 564, 396 N.Y.S.2d 216 (N.Y.Supp.Ct. App.Div. 1977); and Luna v. Rossville Packing Co., 54 Ill. App.3d 290, 12 Ill.Dec. 115, 369 N.E.2d 612 (1977).
I am persuaded, however, that although the trial court directed a verdict on the strict liability count, submission of the case to the jury on the theories of negligence and implied warranty adequately presented to the jury all issues and all theories of liability upon which plaintiff might have been entitled to recover. At the outset, it should particularly be noted that the directed verdict was entered only after all evidence had been presented by both sides. Thus, appellant cannot claim that she was precluded from presenting any evidence that might possibly have had some effect on the jury's consideration of liability. The only other basis for reversal would have to be found in the trial court's failure to instruct the jury on strict liability. The test, on this point, is whether under the particular facts of the case, the instructions misled the jury, or prejudiced a party's right to a fair trial. American National Bank of Jacksonville v. Norris, 368 So.2d 897 (Fla. 1st DCA 1979), cert. den., 378 So.2d 342 (Fla. 1979). For the reasons stated below, I would hold that the error in failing to submit the strict liability count to the jury does not meet this test.
*1112 I would follow the decision of the Fourth District Court of Appeal in Sansing v. Firestone Tire and Rubber Company, 354 So.2d 895 (Fla. 4th DCA 1978), cert. den., 360 So.2d 1250 (Fla. 1978), which held in a similar case that where the trial court instructed the jury on the theory of implied warranty of merchantability, as here, the failure to instruct on strict liability was of no practical significance.[1] The error in the case before us is even less egregious than in Sansing, because here, unlike Sansing, in addition to instructions on implied warranty and negligence, the plaintiff had the benefit of an instruction authorizing the jury to find for the plaintiff under the doctrine of res ipsa loquitur.
The res ipsa loquitur instruction advised the jury:
If you find that the circumstances of the occurrence were such that, in the ordinary course of events, it would not have happened in the absence of negligence, and that the instrumentality causing an injury was in exclusive control of the defendant at the time the negligent act or omission, if any, must have occurred and that the instrumentality, after leaving the defendant's control, was not improperly used or handled by others or subjected to harmful force or conditions, you may infer that the defendant was negligent unless, taking into consideration all the other evidence in the case, you conclude that the occurrence was not due to any negligence on the part of the defendant.
This instruction, given over Opelika's objection, although of questionable application under the facts, was undoubtedly of some benefit to the plaintiff's case. The discussion in Cassisi v. Maytag Co., 396 So.2d 1140 (Fla. 1st DCA 1981), reveals the similarity between the inferences giving rise to recovery under res ipsa loquitur, and those applicable to strict liability. Both legal inferences, the Cassisi opinion noted, are similar in being based upon common sense assumptions that the occurrence of the accident is such that in the ordinary course of events it could not have happened in the absence of negligence, or a defective product, respectively. Additionally, both inferences are founded upon "strong policy considerations that aid a plaintiff in meeting his burden of proof when direct proof of negligence or product defectiveness is wanting." Cassisi, 396 So.2d at 1149. Thus, appellant's argument here that she was prejudiced by denial of her right to have the jury consider a verdict in her favor without proof of specific acts of negligence on Opelika's part is not entirely accurate.
Moreover, appellant's claim of prejudice grounded upon the argument that the jury could not have considered a verdict in her favor without proof of specific acts of negligence is selfcontradictory, under the particular facts of this case. Appellant's entire case was devoted to proof of a specific defect, namely, an improperly welded metal joint which, if it existed, could have resulted only from negligent manufacture on the part of Opelika. In order to establish a defective product, the evidence necessarily *1113 had to also establish negligence. No negligence in manufacture  no defect, since Opelika was not responsible for the design or specifications of the spin buggy.
The majority opinion places great emphasis upon the absence of any instruction for the jury to consider that the "unreasonably dangerous condition" of a product may cause physical harm to the user. The majority alludes to the strict liability definition of a defective product, as one which "is in a condition unreasonably dangerous to the user... ." (Florida Standard Jury Instructions, Pl. 4, "strict liability"). The majority's opinion concludes that the "failure to charge the jury on a product's potential affinity for causing injury is a serious omission," and deplores the absence of an instruction "advising the jury that a defendant may be liable for manufacturing a defective product which may be so unreasonably dangerous as to cause physical harm to a human being, ... ."
If the appellant was prejudiced in any manner by not having the benefit of the "unreasonably dangerous to the user" language, it has not been demonstrated here. In singling out this verbal deficiency, the majority has given critical importance to an element apparently deemed of no significance by the appellant.[2] There is no mention in appellant's brief, or reply brief, of prejudice or potential prejudice by reason of the jury's nonconsideration of the "unreasonably dangerous" character of a defective product. Appellant's argument on this point focuses upon her contention that consideration of the case on the theory of strict liability in tort would have enabled the jury to return a verdict for the plaintiff without being required to find a specific act of negligence. Appellant rationalizes the jury's failure to find liability on the negligence count by asserting that the jury "necessarily concluded that the plaintiff did not prove any specific acts of negligence on the part of the defendant, Opelika." Prejudice appears, it is argued, because (appellant's brief, page 11):
... [H]ad the plaintiff been aided by their count of strict liability and by the jury instructions on that count based on the West decision no specific act of negligence on Opelika's part would have to have been proven. If the jury concluded that the defective product and the plaintiff's subsequent injuries fit within the definition of strict liability, then the defendant Opelika's actions in placing the defective product on the market would have been negligence per se. (West, refers to West v. Caterpillar Tractor Co. Inc., 336 So.2d 80 (Fla. 1976))
As above indicated, appellant's entire case rested solely upon evidence of a defective weld at the break point of the arm-handle being used by appellant to pull the buggy at the time of her fall. Thus, unlike the cases in which a specific act of negligence has not or cannot be proven by the plaintiff, appellant here relied upon a specific act of negligence, i.e., a defective weld, as proof that the spin buggy was defective when it left the hands of the fabricator, Opelika. There is no other evidence from which a jury finding could be made that the product was defective because of any act or omission of Opelika, regardless of whether recovery was being sought under negligence, implied warranty, or strict liability. I fail to see how change of the standard of proof required from "defective," or "negligently constructed," to "defective and unreasonably dangerous" could have benefitted the plaintiff.[3]
Again referring to the recent case of Cassisi v. Maytag Co., supra, there it was *1114 stated that as one of the prerequisites for recovery in products liability cases a plaintiff has the burden  whether the case is based upon negligence, breach of implied warranty, or strict liability  of proving that a defect was present in the product. Although Cassisi dealt primarily with problems of proof encountered by a plaintiff under varying factual circumstances in strict liability actions, it is pertinent to note the discussion in that case concerning the "defective condition  unreasonably dangerous" element in strict liability actions under Section 402A, Restatement of Torts (Second). Cassisi concluded that the terms "defective" and "unreasonably dangerous" are redundant. Cassisi thus conformed to the view expressed by the Supreme Court of Florida in West v. Caterpillar Tractor Company, 336 So.2d 80, 88 (Fla. 1976): "The doctrine of strict liability does not introduce a notion of `defective condition unreasonably dangerous to the user or consumer or to his property,' which is different from the notion of `unmerchantability' as applied in warranty law."
How, then, has the appellant in this case been prejudiced by absence of the terms "unreasonably dangerous" from the jury instruction? We are not aware from our reading of West, Cassisi, or other authorities, of any inference or suggestion that the plaintiff's burden of proving "defective condition  unreasonably dangerous" under strict liability is any less onerous (except for being relieved of any need to prove a specific act of negligence) than the burden of proving that a product is defective under the implied warranty theory. Although it is true, as the majority states, "a product may be defective and still not be likely to cause injury," this would be a matter for argument in defense of liability, not to establish it, on the theory that although defective, the plaintiff must still prove the additional element that the product is "unreasonably dangerous to the user." As a practical matter it appears that "unreasonably dangerous to the user," describes a more defective product than one simply "not reasonably fit for the uses intended or reasonably foreseeable," as a defective product is described under the implied warranty theory. See Florida Standard Jury Instructions P. 2 and P. 4 (June, 1979). This view is supported by cases from a number of jurisdictions which for this reason have either rejected the "unreasonably dangerous" element initially, or have subsequently eliminated the requirement in strict liability cases.[4] As one witness in this case actually testified: "Dangerous is a relatively volatile word."
*1115 In any event, regardless of how one might compare the theories of negligence, implied warranty, and strict liability, the majority has reversed upon a theory which is not argued, directly contradicts the express language of West, is at odds with the reasoned analysis of other courts (see cases cited, footnotes 1-4), and which is not supported by authority or reason.[5]
The majority opinion also goes far afield, it seems to me, in its statement that "the charge below stresses the contractual relationship between the buyer and the seller, or the idea of a contractual action for failure of the plaintiff to receive what had been contracted for... ." I find no suggestion in the trial court's entire instructions that any "contractual issue" was involved in *1116 the case. The court first instructed the jury on the negligence issue, and then, as to breach of implied warranty, instructed the jury that the issue was "whether the buggy was defective ... and if so, whether such defect was a legal cause of injury or damage sustained by the plaintiff." The charge further stated that a product is "defective" if it is "not reasonably fit for the use intended, or reasonably foreseeable by the defendant." There is no mention of contractual relationship, privity, buyer or seller, or any other word that could possibly have contractual implications.[6] Thus, the majority opinion assumes the existence of an element in the jury instructions that is simply not present.
Next, the majority elaborates upon some supposed harm, by reason of the giving of the implied warranty instruction, with respect to the measure of damages awardable. Except from an academic viewpoint, it is difficult to discern how the damages discussion relates to this case. First, there is no suggestion in the briefs or arguments that the trial judge improperly excluded any evidence proffered by appellant on any element of damages,[7] nor that counsel's jury argument and discussion of damages was curtailed or limited in any manner. Furthermore, no objection relating to the instructions on damages was made at the trial, and no issue relating to damages has been raised on this appeal.
Further, while the majority points to authorities dealing with the impropriety of limiting damages under strict liability to those which are "reasonably foreseeable or within the contemplation of the parties," the majority fails to note that no such instruction was given in the court below. In fact, the jury instruction given here clearly authorized the jury to award "the total amount of her damages," in event the jury should find that the defective condition of the spin buggy "was a legal cause of injury or damage sustained by the plaintiff."
Still further, on the subject of damages, while the majority posits a difference in the "measure of damages" recoverable under implied warranty, and those recoverable under strict liability, the Florida Standard Jury Instructions on "Product Liability" (Pl. 2, 3 and 4), "Causation" (No. 5.2), and "Damages" (Nos. 6.1 and 6.2), recognize no such distinction. The fact of the matter is that had the trial court actually given the standard instructions on "strict liability," so far as damages are concerned, the instructions would have been exactly the same as those recommended for implied warranty.[8]
*1117 There were conflicts and inconsistencies in much of the evidence presented in this four-day trial. I would hold that appellant has failed to demonstrate reversible error warranting the setting aside of the jury's verdict, and would affirm.
NOTES
[1] The jury was instructed:

The alternative claims of the plaintiff are a claim of negligence and a claim of breach of implied warranty of the [sic] fitness. On each of these claims, the defendant has denied liability... . The issues for your determination on the breach of implied warranty claim of the plaintiff against the defendant are whether the buggy manufactured, assembled and fabricated by the defendant, Opelika Machine and Welding Company was defective when it left the possession of said defendant and if so, whether such defect was a legal cause of injury or damage sustained by the plaintiff. The product is defective if it is not reasonably fit for the use intended, or reasonably foreseeable by the defendant...
[2] The instruction given the jury in Sansing was as follows:

In order for the plaintiffs to recover from the defendants Ford and Firestone for injuries sustained as a result of a defect in the truck wheel rim assembly involved in this litigation it is necessary that the plaintiff's injuries were caused by some defect or dangerous condition in the wheel rim assembly which makes it unreasonably dangerous to the user. The wheel rim assembly in question must be dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, possessing the knowledge common to the community as to its characteristics. 354 So.2d at 897 (emphasis supplied).
[3] This instruction tracks generally the black letter statement of Section 402A, Restatement of Torts (Second), providing in part: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability for physical harm thereby caused to the ultimate user or consumer, ... ."
[4] This is the "reasonably fit" standard prescribed under the UCC for determining a product's merchantability. See Section 672.314(2)(c), Florida Statutes (1979) (UCC 2.314(2)(c)).
[5] Professor Wade was one of the members of an advisory committee which assisted in drafting Section 402A.
[6] Dean Page Keeton also contributed to drafting Section 402A.
[7] This is a view advocated by certain commentators. See, e.g., R. Parks, A.C. Watts-Fitzgerald, T.A. Watts-Fitzgerald, Products Liability, 33 Mi.L.Rev. 1185, 1206 (1979); D. Maleson, Negligence is Dead But Its Doctrines Rule Us From the Grave: A Proposal to Limit Defendant's Responsibility in Strict Products Liability Actions Without Resort to Proximate Cause, 51 Temple L.Q. 1 (1978).
[8] See Wade, supra, at 933-34.
[9] The damages recoverable for the commission of a tort are of course not circumscribed by any rule of foreseeability as long as the consequences directly and proximately result from the wrongful act, provided that such act is not interrupted by the intervention of an independent cause, without which cause the injury could not have occurred. See Fla.Jur.2d, Damages, § 36 (1980). For a more extended discussion of the differences in the damages recoverable in tort as opposed to contract actions, see Prosser, Law of Torts, § 92 at 619-20 (4th ed. 1971).
[1] To the same effect, see Chestnut v. Ford Motor Company, 445 F.2d 967 (4th Cir.1971), finding no error in submitting the case to the jury solely on the breach of warranty theory, rejecting plaintiff's contention that it was error to refuse to submit the case also on the alternative theories of strict liability in tort and negligence. The Chestnut opinion further points out that except for the additional requirement in negligence, of proving that the defect was the result of the defendant's failure to exercise due care,

the differences between the three rationales of liability consist of varying defenses available to the defendant depending upon whether the theory of the forum is tort or contract: in a tort action, the defendant may raise the defense of contributory negligence; in a contract action, the defendant may raise defenses of lack of privity, lack of notice of the breach, express disclaimer of the warranty, or contractual assumption of risk. (Id. at 969)
Here, as in Chestnut, none of these defenses were raised by the defendant. See also footnote 2 of the opinion, 445 F.2d at 969, citing F. Harper and F. James, § 28.32, and Greeno v. Clark Equip. Co., 237 F. Supp. 427, 429 (N.D. Ind. 1965).
See also annotation 52 A.L.R.3rd 101, "Products Liability  Alternate Instructions," § 2[a], comment page 103, and footnote 13, page 104.
[2] The Supreme Court of Pennsylvania, which has rejected the "unreasonably dangerous" language of Section 402A, noted in Azzarello v. Black Brothers Co., 480 Pa. 547, 556, 391 A.2d 1020, 1025, that the phrase has "no independent significance and merely represent[s] a label to be used where it is determined that the risk of loss should be placed upon the supplier." See also Baker v. Outboard Marine Corp., 595 F.2d 176 (3rd Cir.1979).
[3] In Dooms v. Stewart Bolling & Co., 68 Mich. App. 5, 241 N.W.2d 738 (1976), the court held that although Michigan does not recognize "strict liability in tort" as a third theory of products liability, the defendant manufacturer against whom a verdict was rendered was not entitled to reversal merely because the trial judge instructed the jury on "strict liability," using the "unreasonably dangerous condition to the user," language of 402A, Restatement of Torts (Second). The reasoning of the Michigan court is illuminating. First, the court made it plain that it would not sanction an instruction on strict liability in tort because: "First and foremost, we believe such a theory is unnecessary." The court then reasoned that it appeared "inconceivable that a plaintiff might fail to recover under our tort warranty of fitness theory, yet recover under a strict liability in tort theory." (Id. 241 N.W.2d at 741). Further, page 743:

This court opines that if the condition of a product is unreasonably dangerous as well as defective (strict liability theory) then the product would necessarily be unfit for the use anticipated or reasonably foreseeable (implied warranty in law theory).
We cannot conceive that had the jury found the rubber milling machine to be in a defective and unreasonably dangerous condition, it could still find the machine reasonably fit for the use anticipated or reasonably foreseeable. Conversely, we cannot conceive that if the jury determined the machine was reasonably fit for the use anticipated or reasonably foreseeable (thus rejecting implied warranty) it could nevertheless find that the machine was defective and unreasonably dangerous (thus finding strict liability).
[4] It should first be noted that California, which pioneered in the development of the strict liability in tort theory, has not adopted the "unreasonably dangerous" phraseology of Section 402A. Greenman v. Yuba Power Products Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963); Cronin v. J.B.E. Olson Corp., 8 Cal.3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972); Barker v. Lull Engineering Co. Inc., 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978). Of particular interest is the statement of the court in Cronin, supra (104 Cal. Rptr. at 453, 501 P.2d at 1173):

In summary, we have concluded that to require an injured plaintiff to prove not only that the product contained a defect but also that such defect made the product unreasonably dangerous to the user or consumer would place a considerably greater burden upon him than that articulated in Greenman.
More recently, the California court in Barker, supra, has made it clear that the Cronin rejection of the "unreasonably dangerous" terminology extended not only to cases involving design defects, but to manufacturing defects also.
A jury verdict for the defendant was reversed in Hansen v. Cessna Aircraft Co., 578 F.2d 679 (7th Cir.1978), because the trial judge instructed the jury on the theory of strict liability only, and rejected plaintiff's requested negligence instructions. Again, the language of the federal court, applying Wisconsin law, is illuminating. The court rejected the argument by the defendant that the jury's finding that there was no defect that was "unreasonably dangerous" precludes a finding that there was negligence that caused the plaintiff's injuries, therefore no error in refusing a negligence instruction. In alluding to the Wisconsin Supreme Court's decisions recognizing clear-cut distinctions between "negligence" and "strict liability" under the "unreasonably dangerous" formulation, the court stated (Id. at 684):
It is quite possible that the Wisconsin Supreme Court was fearful that the term [`unreasonably dangerous'] might connote more to a jury deciding a products liability case than the `obviousness' of a defect in the product at issue. As one commentator has noted the term `unreasonably dangerous' `sounds as if the requisite proof for a product defect is some form of `extraordinary' danger.' (quoting from Twerski, Note, Products Liability in Wisconsin, 1977 Wis.L.Rev. 227, at 334).
The Barker case, supra, describes the "unreasonably dangerous" terminology as representing "an undue restriction" on the application of strict liability principles, and further points out that it has been viewed "as shielding a defendant from liability... ." 143 Cal. Rptr. at 233, 573 P.2d at 451. Further, according to the editors of the annotation in 54 A.L.R.3d 352, the "unreasonably dangerous" element is used to "limit the scope of the strict tort liability doctrine... ." Id. at 358.
New Jersey and West Virginia have also rejected the "unreasonably dangerous" term. Cepeda v. Cumberland Engineering Co. Inc., 76 N.J. 152, 386 A.2d 816 (1978); MorningStar v. Black & Decker Mfg. Co., W. Va., 253 S.E.2d 666 (1979). It is also interesting to note, as pointed out in the MorningStar opinion (253 S.E.2d at 681-682) that Dean Wade (whose article in 44 Miss. Law Journal is cited by the majority in support of its decision) adopts the term "not duly safe" instead of "defective condition unreasonably dangerous" in his suggested model instruction on strict liability. See, 44 Miss. Law Journal 825, 839-840 (1973).
[5] Dean Wade, in his article On The Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 830 (1973) traces the origin of the terms "defective" and "unreasonably dangerous" as found in the restatement, Section 402A. He points out that while the two terms "may seem redundant," they were joined together by an "or" instead of an "and," and this has created problems of its own. He inquires, assuming the two terms are not "entirely synonymous," and if it is "too much" to insist that the product be "both defective and unreasonably dangerous," which term "is the more appropriate?" Significantly, while he finds difficulties in the use of the term "defective," he states that its "natural application would be limited to the situation in which something went wrong in the manufacturing process, so that the article was defective in the sense that the manufacturer had not intended it to be in that condition." (Id. at 831). Parenthetically, it is observed that in this case we are dealing with a "manufacturing defect." Therefore, the term "defective," according to Dean Wade's analysis, was used in its "natural application." Of further significance, in discussing "unreasonably dangerous," the very first "problem" Dean Wade finds in the use of the term is stated as follows: "It may suggest an idea like ultrahazardous, or abnormally dangerous, and this gives rise to the impression that the plaintiff must prove that the product was unusually or extremely dangerous." (Id. at 831). Dean Wade then makes a thorough case for the proposition that whatever word or phrase is used, "a further explanation or indication of meaning is needed." (Id. at 833).

From the foregoing, it is difficult to determine in what manner the majority considers that Dean Wade's article supports a reversal in this case. As already indicated, in footnote 4, Dean Wade suggests abandonment of the "unreasonably dangerous" terminology.
[6] Appellant's main brief makes the argument that the jury's denial of a verdict for appellant on implied warranty was because "the jury certainly could have determined that there was no contractual relationship between the plaintiff Ida Jean Hartman and the defendant Opelika Machine and Welding Company... ." This argument has no foundation in reality, as pointed out by appellee's brief, because the jury was never instructed that a contractual relationship was necessary, and never instructed to determine whether or not a contractual relationship existed. Thus "contractual relationship" never entered the case. Appellant's reply brief contains no response to appellee's argument on this point. There is no "privity" requirement for implied warranty action by an employer of a purchaser if it is "reasonable to expect such person may use" the product. Section 672.318, Florida Statutes.
[7] As previously noted, the trial court's ruling granting a directed verdict on the strict liability count came at the conclusion of the testimony, after both sides had rested.
[8] Instruction 5.2, covering "Legal Cause (Product Liability)," follows the identical standard used in negligence (tort cases (instruction 5.1)). Under these instructions, either negligence or a defect in a product is the legal cause of injury or damages "if it directly and in natural and continuous sequence produces or contributes substantially to producing such ... [injury] [or] [damage], so that it can reasonably be said that, but for ..." the negligence, or defect, "... the [injury] [or] [damage] would not have occurred." Instructions 5.1, 5.2. See, Model Charge No. 7, Florida Standard Jury Instructions (pages 32-35, 1980-81 revisions).

The trial judge gave the legal causation instruction, number 5.1, in connection with the negligence count, but omitted the comparable instruction, 5.2, with respect to implied warranty. However, since appellant based her attempted recovery, in part, upon the implied warranty theory, and requested the implied warranty instruction, it was counsel's duty to make timely objection to any error or omission in the jury instructions. As given, however, the instructions with respect to damages contained no such limitations as are suggested by the majority opinion, and the instructions clearly authorized the jury to return a verdict for all injuries or damages proved by the appellant.