[Sac. No. 7913. In Bank. Oct. 17, 1972.]

WILLIAM CRONIN, Plaintiff and Respondent, v.
J.B.E. OLSON CORPORATION, Defendant and Appellant;
STATE COMPENSATION INSURANCE FUND,
Intervener and Respondent.

---

---

## COUNSEL

Mayall, Hurley, Knutsen, Smith & Green and C. D. Knutsen for Defendant and Appellant.

Hulsey, Beus & Wilson and Roger D. Hulsey for Plaintiff and Respondent.

Robert E. Cartwright, Edward I. Pollock, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Thomas T. Anderson, Joseph W. Cotchett and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Respondent.

T. Groezinger, Loton Wells and Herbert Lasky for Intervener and Respondent.

---

## OPINION

**SULLIVAN, J.**—In this products liability case, the principal question which we face is whether the injured plaintiff seeking recovery upon the theory of strict liability in tort must establish, among other facts, not only that the product contained a defect which proximately caused his injuries but also that such defective condition made the product unreasonably dangerous to the user or consumer. We have concluded that he need not do so. Accordingly, we find no error in the trial court's refusal to so instruct the jury. Rejecting as without merit various challenges to the sufficiency of the evidence, we affirm the judgment.

On October 3, 1966, plaintiff, a route salesman for Gravem-Inglis Bakery Co. (Gravem) of Stockton, was driving a bread delivery truck along a rural road in San Joaquin County. While plaintiff was attempting to pass a pick-up truck ahead of him, its driver made a sudden left turn, causing the pick-up to collide with the plaintiff's truck and forcing the latter off the road and into a ditch. As a result, plaintiff was propelled through the windshield and landed on the ground. The impact broke an aluminum safety hasp which was located just behind the driver's seat and designed to hold the bread trays in place. The loaded trays, driven forward by the abrupt stop and impact of the truck, struck plaintiff in the back and hurled him through the windshield. He sustained serious personal injuries.

The truck, a one-ton Chevrolet stepvan with built-in bread racks, was one of several trucks sold to Gravem in 1957 by defendant Chase Chevrolet Company (Chase), not a party to this appeal. Upon receipt of Gravem's order, Chase purchased the trucks from defendant J.B.E. Olson Corporation (Olson), which acted as sales agent for the assembled vehicle, the chassis, body, and racks of which were manufactured by three subcontractors. The body of the van contained three aisles along which there were welded runners extending from the front to the rear of the truck. Each rack held ten bread trays from top to bottom and five trays deep; the trays slid forward into the cab or back through the rear door to facilitate deliveries.

Plaintiff brought the present action against Chase, Olson and General Motors Corporation[1] alleging that the truck was unsafe for its intended use because of defects in its manufacture, in that the metal hasp was exceedingly porous, contained holes, pits and voids, and lacked sufficient tensile strength to withstand the impact. Defendants' answers denied the material allegations of the complaint and asserted the affirmative defense of contributory negligence.[2] Subsequently, upon leave of court, the additional defense of assumption of the risk was asserted.

At the trial, plaintiff's expert testified, in substance, that the metal hasp broke, releasing the bread trays, because it was extremely porous and had a significantly lower tolerance to force than a non-flawed aluminum hasp would have had. The jury returned a verdict in favor of plaintiff and against Olson in the sum of $45,000 but in favor of defendant Chase and against

---

[1]Defendant General Motors Corporation, manufacturer of the chassis, was voluntarily dismissed by plaintiff prior to trial.

[2]The State Compensation Insurance Fund, Gravem's compensation carrier, filed a notice of lien covering the compensation benefits paid to plaintiff and, pursuant to leave of court, filed a complaint in intervention.

plaintiff.[3] Judgment was entered accordingly. This appeal by Olson followed.

Defendant[4] attacks the sufficiency of the evidence to support the verdict and the trial court's instruction on strict liability. The challenge to the evidence is multi-pronged, claiming in effect that plaintiff produced no evidence on several essential issues. We first turn to this challenge, considering defendant's arguments in the order presented.

## 1. Sufficiency of the Evidence

Defendant first contends that plaintiff failed to show the defective hasp to be the same one originally supplied by the manufacturer. The record contains no evidence as to the use or maintenance of the van from the time it was purchased by Gravem in 1957 until plaintiff began to drive it five years later. Plaintiff admitted that the racks had been modified by the addition of reinforcement bars welded onto a hinge mechanism which the hasp fastened in a closed position to hold the trays in place. But that admission does not derogate from the implied finding that the hasp itself was the original one supplied by the manufacturer. Contrary to defendant's claim that no evidence was introduced on this point, plaintiff's expert witness testified that he saw no indication of any repair of the hasp itself. When there is sufficient evidence to support a factual finding, it is not within the province of an appellate court to reexamine or reweigh it. (*Crawford* v. *Southern Pacific Co.* (1953) 3 Cal.2d 427, 429 [45 P.2d 183].)

It is next urged that plaintiff's evidence failed to show any condition of the hasp which could be considered defective. The gist of the argument on this point appears to be that "defectiveness" cannot be properly determined without proof of some standard set by knowledgeable individuals for the manufacture and use of the particular part under scrutiny and that plaintiff's expert applied "his own unilateral standard" in giving his opinion that the hasp was defective. In the absence of an appropriate standard, so it is argued, all proof must fail.

---

[3]In answer to a special interrogatory the jury unanimously agreed that Gravem was not aware of any defect in the bread racks prior to the accident and hence was not contributorily negligent. This finding had the effect of allowing the lien filed by Gravem's compensation carrier. Contrary to Olson's claim, the evidence supporting the implied finding of a defect in the hasp also supports the finding that Gravem was not negligent.

[4]Hereafter, unless otherwise specified, our reference to "defendant" means Olson, since it is the sole defendant on appeal.

The argument lacks merit. Gravem purchased the van and its bread racks from Chase as a unit. Since there were no standard bread racks available, Chase in turn ordered them from Olson according to the latter's blueprint, and left to Olson the manufacture of a safe set of bread racks. ■ Olson admitted through the testimony of its vice president that the purpose of the locking device on the bread rack (of which the hasp was a part) was to hold the trays in place and that it knew that the van was to be driven on public highways. In short, the evidence shows that the intended purpose of the locking device was to keep the bread trays from moving forward into the driver's compartment as a result of any foreseeable movements of the van in highway travel.

The record shows that the hasp, because it was defective, did not fulfill this purpose. Plaintiff's expert testified that the broken hasp was "extremely porous and extremely defective" as it was full of holes, voids and cracks. These flaws were in the metal itself and resulted in the hasp's lowered tolerance to force. He further stated that this condition could not be attributed to prolonged use. This conclusion was buttressed by the expert's testimony that the break in the hasp was a tensile fracture caused by sudden force rather than a fatigue fracture, which is by nature progressive. The hasp failed because "[i]t was just a very, very bad piece of metal. Simply would not stand any force—reasonable forces at all."

Olson's argument that the van was built only for "normal" driving is unavailing. ■ We agree that strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable. ■ Although a collision may not be the "normal" or intended use of a motor vehicle, vehicle manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products. (*Passwaters* v. *General Motors Corporation* (8th Cir. 1972) 454 F.2d 1270, 1276; *Larsen* v. *General Motors Corporation* (8th Cir. 1968) 391 F.2d 495, 501-503; 80 Harv.L.Rev. 688, 689 (1967); contra, *Evans* v. *General Motors Corporation* (7th Cir. 1966) 359 F.2d 822, 825, cert. den. 385 U.S. 836 [17 L.Ed.2d 70, 87 S.Ct. 83].) The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use.

Despite its claim that Gravem used the van beyond its life span, Olson did not show that the van was delivered with any warning that it would not remain safe after seven or eight years. Nor did it show that by reason of age the van was obviously dangerous.

Defendant claims that the hasp was not intended to be used without inspection and repair. However, the expert testimony offered by plaintiff established that the hasp failed because of internal holes, cracks and voids not visible to the naked eye. ■ In any event, the mere failure to discover defects in the product is not a defense in a strict liability case. (*Barth v. B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 243 [71 Cal. Rptr. 306].)

■ Finally, defendant contends that plaintiff failed to prove proximate causation between the defect in the hasp and the accident. It is urged that the hasp did not cause the collision. Plaintiff, however, does not argue that the hasp caused the accident, but only that its defectiveness was a substantial factor contributing to his injuries. Defendant argues that the fracture of the hasp did not propel plaintiff through the windshield. But plaintiff's expert witness testified that if the hasp had not been porous, it would have withstood the impact and kept the trays in place. The hasp's fragility therefore had a direct, rather than a remote, connection with plaintiff's injuries. There is ample evidence in the record supportive of the jury's implied finding of proximate causation.

## 2. *The Instruction on Strict Liability*

Defendant's remaining contention requires us to probe the essential elements of products liability. It is claimed that in instructing the jury as to the issues upon which plaintiff had the burden of proof[5] the trial court erred by submitting a definition of strict liability which failed to include, as defendant requested,[6] the element that the defect found in the product

---

[5]That instruction reads in pertinent part as follows:

"In this action, the plaintiff has the burden of proving by a preponderance of the evidence all of the facts necessary to prove the following issues as to each defendant seller:

"1. That the seller placed the equipment on the market for use under circumstances where he knew that such equipment would be used without inspection for defects;

"2. That there was a defect in the manufacture or design of the equipment involved;

"3. That the user was not aware of the said defect;

"4. That the equipment was being used for the purpose for which it was designed and intended to be used;

"5. That the injuries and damages complained of were proximately caused by the said defect;

"6. The nature and extent of the injuries and damages sustained by the plaintiff."

[6]The court refused defendant's instruction which provided in pertinent part that, "Plaintiff has burden of proving: . . . (2) That the defective condition made it unreasonably dangerous to the user or consumer. . . ."

be "unreasonably dangerous." It is urged that without this element, for which Olson finds support in section 402A of the Restatement Second of Torts (1965) and in recent decisions of this court (see *Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 384 [93 Cal.Rptr. 769, 482 P.2d 681]; *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 475 [85 Cal. Rptr. 629, 467 P.2d 229]), a seller would incur absolute liability for any injury proximately caused by an intended use of a product, regardless of the insignificance of the risk posed by the defect or the fortuity of the resulting harm.

The encapsulation in appropriate jury instructions of the doctrine of strict liability in tort as announced in the decision of this court in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] has apparently given rise to some confusion. The instruction given in the case at bench, although drafted by the trial judge, was apparently based upon BAJI No. 218-A,[7] the then-current instruction on products liability. Prior to this appeal, however, BAJI No. 218-A was superseded by BAJI Nos. 9.00[8] and 9.01[9] which require a

---

[7]BAJI No. 218-A provides: "The manufacturer [retailer] of an article who places it on the market for use under circumstances where he knows that such article will be used without inspection for defects, is liable for injuries proximately caused by defects in the manufacture or design of the article of which the user was not aware, provided the article was being used for the purpose for which it was designed and intended to be used."

[8]BAJI No. 9.00 provides: "The [manufacturer] [retailer] of an article who places it on the market for use under circumstances where he knows that such article will be used without inspection for defects in the particular part, mechanism, or design which is claimed to have been defective, is liable for injuries proximately caused by defects in the manufacture or design of the article which caused it to be unreasonably dangerous and unsafe for its intended use and of which the user was not aware, provided the article was being used for the purpose for which it was designed and intended to be used.

"[An article is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.]

"The plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove each of the foregoing conditions."

[9]BAJI No. 9.01 provides: "The defendant . . . is not required under the law so to create and deliver its product as to make it accident proof; however, he is liable to the plaintiff for any injury suffered by him if the plaintiff establishes by a preponderance of the evidence all of the facts necessary to prove each of the following conditions:

"First: The defendant placed the . . . in question on the market for use, and the defendant knew, or in the exercise of reasonable care should have known, that the particular . . . would be used without inspection for defects in the particular part, mechanism or design which is claimed to have been defective;

"Second: The . . . was defective in design or manufacture at the time it was placed on the market and delivered;

"Third: The plaintiff was unaware of the claimed defect;

showing that the defect made the product "unreasonably dangerous." Thus, defendant insists that this characteristic of the defect is an essential element of the doctrine.

The history of strict liability in California indicates that the requirement that the defect made the product "unreasonably dangerous" crept into our jurisprudence without fanfare after its inclusion in section 402A of the Restatement Second of Torts in 1965 (see fns. 12 and 13, *infra*). The question raised in the instant matter as to whether the requirement is an essential part of the plaintiff's case is one of first impression.

Until our decision in *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, strict liability for defective products was, in effect, imposed *sub silentio* by extension of the warranty doctrine.[10] As early as 1944, Justice Traynor, concurring in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 [150 P.2d 436], urged this court to dispense with negligence as the basis of recovery in defective products cases, to discard the fictions of warranty, and to replace them with absolute liability. "[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." But the pronouncement of such a rule had to await the *Greenman* case in 1963 in which Justice Traynor wrote for a unanimous

"Fourth: The claimed defect was a [proximate] [legal] cause of any such injury to the plaintiff occurring while the . . . was being used in the way and for the general purpose for which it was designed and intended, and

"Fifth: The defect, if it existed, made the . . . unreasonably dangerous and unsafe for its intended use.

"[An article is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics.]"

[10]Dean Prosser has provided us with an excellent account of this development. At first the "implied warranty" of safety was recognized only in cases involving food, drink, and drugs (*Mazetti* v. *Armour & Co.* (1913) 75 Wash. 622, 630 [135 P. 633] (prepared meat)). The expansion of the doctrine beyond such products not unexpectedly began with products for intimate bodily use (*Graham* v. *Bottenfield's, Inc.* (1954) 176 Kan. 68, 74 [269 P.2d 413] (hair dye)) and animal food (*McAfee* v. *Cargill, Inc.* (S.D.Cal. 1954) 121 F.Supp. 5, 6). In 1958 the Michigan Supreme Court allowed recovery based on implied warranty without privity for property damage caused by defective cinder building blocks (*Spence* v. *Three Rivers Builders & Masonry Supply* (1958) 353 Mich. 120, 135 [90 N.W.2d 873]). The last vestiges of the privity of contract doctrine, the most common obstacle to recovery under the implied warranty theory, vanished quickly after the landmark decision in *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358, 383-384 [161 A.2d 69, 75 A.L.R.2d 1], which was followed by most jurisdictions and applied to a variety of products (see generally Prosser, Law of Torts (4th ed. 1971) pp. 650-656; Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)* (1960) 69 Yale L.J. 1099, 1103-1114).

court: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. . . . [T]he liability is not one governed by the law of contract warranties but by the law of strict liability in tort." (59 Cal.2d at pp. 62-63.)

Greenman had been injured when a piece of wood on which he was working flew out of his Shopsmith, a combination power tool usable as a saw, drill, and wood lathe. "To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware[11] that made the Shopsmith unsafe for its intended use." (*Id.* at p. 64.)

During the following decade the *Greenman* rule has been made applicable to retailers (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 263 [37 Cal.Rptr. 896, 391 P.2d 168]); bailors and lessors (*Price* v. *Shell Oil Company* (1970) 2 Cal.3d 245, 248 [85 Cal.Rptr. 178, 466 P.2d 722]); wholesalers and distributors (*Barth* v. *B. F. Goodrich Tire Co., supra,* 265 Cal.App.2d 228, 252-253; *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 52 [46 Cal.Rptr. 552]); and sellers of mass-produced homes (*Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227 [74 Cal.Rptr. 749]). Its protection has been extended to bystanders (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 586 [75 Cal.Rptr. 652, 451 P.2d 84]). Recovery under the rule for solely economic losses has, however, been withheld (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 18-19 [45 Cal.Rptr. 17, 403 P.2d 145]). But throughout the development of the *Greenman* rule we have said very little to explain what we meant in that case by a "defect" which would give rise to liability if injury were proximately caused thereby.

The addition of section 402A[12] to the Restatement Second of Torts upon

---

[11]We construe the "awareness" requirement today in *Luque* v. *McLean, post,* page 136 [104 Cal.Rptr. 443, 501 P.2d 1163].

[12]Section 402A provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

its publication in 1965[13] quickly exerted a pervasive influence on the decisional law. Ironically, when this section was first published, it mirrored the law in a limited number of states (Rest.2d Torts (Tent. Draft No. 10 (1964)) § 402A, note, p. 2; see generally Titus, *Restatement (Second) of Torts Section 402A and the Uniform Commercial Code* (1970) 22 Stan.L.Rev. 713). Since then, however, a substantial majority of jurisdictions have adopted the basic position which it espouses. (Prosser, Law of Torts, *supra,* pp. 657-658.)

We have not hesitated to reach conclusions contrary to those set forth in Restatement section 402A (see *Price v. Shell Oil Company, supra,* 2 Cal.3d 245, 253), but we and the Courts of Appeal have more frequently adopted than challenged its basic outlines. In numerous cases this court and the Courts of Appeal have referred to the Restatement and the *Greenman* standards in tandem, as if they were for all practical purposes identical.[14] (See, e.g., *Jiminez v. Sears, Roebuck & Co., supra,* 4 Cal.3d 379, 383-384; *Pike v. Frank G. Hough Co., supra,* 2 Cal.3d 465, 475; *Putensen v. Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1072 [91 Cal.Rptr. 319]; *Canifax v. Hercules Powder Co., supra,* 237 Cal.App.2d 44, 51-52; see also Witkin, Summary of Cal. Law (1969 Supp.) Torts, § 388C, p. 766 ["The *Greenman* rule . . . was embodied in new Torts Restatement, § 402A . . . ."].) But in none of these cases did the decision turn, as it does in the instant case, on whether the jury must decide that the injuries were caused by a "defective" product or by a product in a "defective condition unreasonably dangerous."

Indeed, generally speaking the similarities between the *Greenman* standard and the Restatement formulation are greater than their differences.[15] The literature frequently refers to *Greenman* and Restatement

---

[13]A draft of section 402A, limited to sales of "food" (albeit broadly defined) was first introduced in 1961. (Rest.2d Torts, § 402A, com. c., pp. 34-35 (Tent. Draft No. 6 (1961)).) A revision of the section, adopted in 1962, extended strict liability to products for "intimate bodily use." (Tent. Draft No. 7 (1962).) Another emendation in 1964 extended strict liability to "any product" in line with developments, including *Greenman,* in the intervening years. (Tent. Draft No. 10 (1964).) The Restatement Second of Torts was published in final form in 1965. (Titus, *Restatement (Second) of Torts Section 402A and the Uniform Commercial Code* (1970) 22 Stan.L.Rev. 713.)

[14]It is notable that in the *Pike* case, in which we supposedly "adopted" "the standard of strict liability as stated in the Restatement" (*Putensen v. Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1072 [91 Cal.Rptr. 319]), we nowhere disavowed *Greenman* nor considered ourselves in conflict with that "landmark opinion" (*Pike v. Frank G. Hough Co., supra,* 2 Cal.3d 465, 475).

[15]In an article discussing the definitional and theoretical difficulties involved in applying a "defective product" standard, the author of the *Greenman* opinion refers

section 402A in the same breath, recognizing their broad expanse of identity without bothering to labor over any subtle distinctions. (See, e.g., Annot., 13 A.L.R.3d 1057, 1080 (1967); Titus, *supra,* 22 Stan.L.Rev. 713, 720.) More recently, in adopting the *Greenman* rule of strict liability, the Alaska Supreme Court clearly recognized that the jurisdictions which have judicially adopted the doctrine "are divided between the approaches of *Greenman* and the Restatement . . . ." (*Clary* v. *Fifth Avenue Chrysler Center, Inc.* (Alaska 1969) 454 P.2d 244, 247.)

The almost inextricable intertwining of the *Greenman* and Restatement standards in our jurisprudence was inevitable, considering the simplicity of *Greenman* and the fuller guidance for many situations offered by the Restatement and its commentary. Nevertheless, the issue now raised requires us to examine and resolve an apparent divergence in the two formulations.

We begin with section 402A itself. According to the official comment to the section, a "defective condition" is one "not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." (Rest.2d Torts, § 402A, com. g.) Comment i, defining "unreasonably dangerous," states, "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Examples given in comment i make it clear that such innocuous products as sugar and butter, unless contaminated, would not give rise to a strict liability claim merely because the former may be harmful to a diabetic or the latter may aggravate the blood cholesterol level of a person with heart disease. Presumably such dangers are squarely within the contemplation of the ordinary consumer. Prosser, the reporter for the Restatement, suggests that the "unreasonably dangerous" qualification was added to foreclose the possibility that the manufacturer of a product with inherent possibilities for harm (for example, butter, drugs, whiskey and automobiles) would become "automatically responsible for all the harm that such things do in the world." (Prosser, *Strict Liability to the Consumer in California* (1966) 18 Hastings L.J. 9, 23.)

The result of the limitation, however, has not been merely to prevent the seller from becoming an insurer of his products with respect to all harm generated by their use. Rather, it has burdened the injured plaintiff with proof of an element which rings of negligence. As a result, if, in the

to the similarities between *Greenman* and section 402A without pointing out the difference here in controversy. (Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 366.)

view of the trier of fact, the "ordinary consumer" would have expected the defective condition of a product, the seller is not strictly liable regardless of the expectations of the injured plaintiff. If, for example, the "ordinary consumer" would have contemplated that Shopsmiths posed a risk of loosening their grip and letting the wood strike the operator, another Greenman might be denied recovery. In fact, it has been observed that the Restatement formulation of strict liability in practice rarely leads to a different conclusion than would have been reached under laws of negligence. (Rheingold, *Proof of Defect in Product Liability Cases* (1971) 38 Tenn.L.Rev. 325, 326, fn. 5; Keeton, *Products Liability— Some Observations About Allocation of Risks* (1966) 64 Mich.L.Rev. 1329, 1340-1341; Wade, *Strict Tort Liability of Manufacturers* (1965) 19 Sw.L.J. 5, 15; Prosser, *supra*, 69 Yale L.J. 1099, 1119; Note, *Products Liability and Section 402A of the Restatement of Torts* (1966) 55 Geo. L.J. 286, 323; contra, Kessler, *Products Liability* (1967) 76 Yale L.J. 887, 901.) Yet the very purpose of our pioneering efforts in this field was to relieve the plaintiff from problems of proof inherent in pursuing negligence (*Escola* v. *Coca Cola Bottling Co., supra,* 24 Cal.2d 453, 461-462 (Traynor, J., concurring)) and warranty (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63) remedies, and thereby "to insure that the costs of injuries resulting from defective products are borne by the manufacturers . . . ." (*Id.;* see *Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245, 251.)

Of particular concern is the susceptibility of Restatement section 402A to a literal reading which would require the finder of fact to conclude that the product is, first, defective and, second, unreasonably dangerous. (Note, *supra,* 55 Geo.L.J. 286, 296.) A bifurcated standard is of necessity more difficult to prove than a unitary one. But merely proclaiming that the phrase "defective condition unreasonably dangerous" requires only a single finding would not purge that phrase of its negligence complexion. We think that a requirement that a plaintiff also prove that the defect made the product "unreasonably dangerous" places upon him a significantly increased burden and represents a step backward in the area pioneered by this court.

We recognize that the words "unreasonably dangerous" may also serve the beneficial purpose of preventing the seller from being treated as the insurer of its products. However, we think that such protective end is attained by the necessity of proving that there was a defect in the manufacture or design of the product and that such defect was a proximate cause of the injuries. Although the seller should not be responsible for all injuries involving the use of its products, it should be liable for all

injuries proximately caused by any of its products which are adjudged "defective."[16]

We can see no difficulty in applying the *Greenman* formulation to the full range of products liability situations, including those involving "design defects." A defect may emerge from the mind of the designer as well as from the hand of the workman.

The *Greenman* case itself indicated that "[t]o establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in *design and manufacture* . . . ." (59 Cal.2d at p. 64; italics added), thereby suggesting the difficulty inherent in distinguishing between types of defects. Although it is easier to see the "defect" in a single imperfectly fashioned product than in an entire line badly conceived, a distinction between manufacture and design defects is not tenable. (*Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 475; Kessler, *supra,* 76 Yale L.J. 887, 900, fn. 71.)

The most obvious problem we perceive in creating any such distinction is that thereafter it would be advantageous to characterize a defect in one rather than the other category. It is difficult to prove that a product ultimately caused injury because a widget was poorly welded—a defect in manufacture—rather than because it was made of inexpensive metal difficult to weld, chosen by a designer concerned with economy—a defect in design. The proof problem would, of course, be magnified when the article in question was either old or unique, with no easily available basis for comparison. We wish to avoid providing such a battleground for clever counsel. Furthermore, we find no reason why a different standard, and one harder to meet, should apply to defects which plague entire product lines. We recognize that it is more damaging to a manufacturer to have an entire line condemned, so to speak, for a defect in design, than a single product for a defect in manufacture. But the potential economic loss to a manufacturer should not be reflected in a different standard of proof for an injured consumer.

■ In summary, we have concluded that to require an injured plaintiff to prove not only that the product contained a defect but also that such defect made the product unreasonably dangerous to the user or consumer

---

[16]We recognize, of course, the difficulties inherent in giving content to the defectiveness standard. However, as Justice Traynor notes, "there is now a cluster of useful precedents to supersede the confusing decisions based on indiscriminate invocation of sales and warranty law." (Traynor, *supra,* 32 Tenn.L.Rev. 363, 373.)

would place a considerably greater burden upon him than that articulated in *Greenman*. We believe the *Greenman* formulation is consonant with the rationale and development of products liability law in California because it provides a clear and simple test for determining whether the injured plaintiff is entitled to recovery. We are not persuaded to the contrary by the formulation of section 402A which inserts the factor of an "unreasonably dangerous" condition into the equation of products liability.

We conclude that the trial court did not err by refusing to instruct the jury that plaintiff must establish that the defective condition of the product made it unreasonably dangerous to the user or consumer.

The judgment is affirmed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.