[No. A037335. First Dist., Div. Five. Sept. 29, 1988.]

JAMES VERMEULEN et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
ARMSTRONG WORLD INDUSTRIES, INC., et al., Real Parties in
Interest.

[No. A037462. First Dist., Div. Five. Sept. 29, 1988.]

ARMSTRONG WORLD INDUSTRIES, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
JAMES VERMEULEN et al., Real Parties in Interest.

1194

**COUNSEL**

Steven Kazan, Burton Danziger, Bryce C. Anderson, Sterns, Walker & Grell and Christopher E. Grell for Petitioners in No. A037335 and Real Parties in Interest in No. A037462.

No appearance for Respondent.

George A. Cumming, Jr., Thomas M. Peterson, Stephen M. Snyder, Brobeck, Phleger & Harrison, Eliot S. Jubelirer, Morgenstein & Jubelirer, James N. Penrod and Hassard, Bonnington, Rogers & Huber for Petitioners in No. A037462 and Real Parties in Interest in No. A037335.

**OPINION**

**HANING, J.**—These consolidated petitions for writ of mandate seek review of pretrial evidentiary rulings made in the Alameda County Complex Asbestos Litigation cases.[1] The challenged evidentiary rulings consist of

---

[1] To avoid confusion, we refer to the parties as plaintiffs and defendants as they stand below. Plaintiffs, petitioners in A037335 and real parties in A037462, are those plaintiffs represented by the Steven Kazan law office. Defendants, real parties in A037335 and petitioners in A037462, are a number of asbestos companies, including Armstrong World Industries, Inc., who have formed a mutual defense association known as the Asbestos Claims Facility.

three general orders issued pursuant to section 19 of the Standards of Judicial Administration,[2] and are generally applicable to approximately 2,000 cases wherein the plaintiffs are seeking damages for personal injuries or wrongful death resulting from use of or exposure to asbestos products.

We initially denied both petitions, primarily because of the state of the record. By agreement of counsel, normal motion procedure was not followed in the proceedings which resulted in the orders under review. There are no reporters' transcripts of the hearings on the motions underlying the orders. The exact scope of the motions is also uncertain. The record contains no factual statement, and is typical of those situations where everyone concerned presumably understands the factual predicate, but the parties fail to provide a sufficient record for review.[3] As a consequence, we have no way of knowing what types of asbestos products, product applications, use of or exposure to asbestos are involved in the hundreds of cases concerned.

The Supreme Court granted review of defendants' petition and transferred back both petitions with directions to issue an alternative writ. The Supreme Court's transfer order states that "the purpose of Standard 19 of the Standards of Judicial Administration, and of management of this litigation under that standard as 'complex litigation,' would best be served by pretrial review of the orders . . . ."

We preliminarily note that our review in this particular complex litigation matter does not signal that writ review will generally lie to resolve issues of admissibility of evidence. (See, e.g., *People* v. *Municipal Court* *(Ahnemann)* (1974) 12 Cal.3d 658, 660 [117 Cal.Rptr. 20, 527 P.2d 372]; Cal. Civil Writs (Cont.Ed.Bar 1987) § 10.66, p. 434.) The general orders under review herein are applicable to over 2,000 individual cases pending trial in Alameda County which have been designated by the superior court as complex litigation under standard 19, and consolidated for pretrial purposes. Complex litigation under standard 19 is designed to facilitate pretrial resolution of evidentiary and other issues, and to minimize the time and expense of lengthy and/or multiple trials. The parties agree that these cases contain common issues of law and fact and, in many instances, common

---

[2] Section 19, Standards of Judicial Administration is attached as Appendix A. All further references to standard 19 are to the same.

[3] We have a partial reporter's transcript containing argument on one of the general orders (No. 7.02) at issue herein. However, the scope of the motion is not fully revealed by the argument, and no factual recitation or analysis is presented, although in their points and authorities below the parties allude to "the facts of this case [*sic*]." Motions were apparently made by counsel representing different plaintiffs, but the record does not indicate whether those plaintiffs were involved in factually similar cases. Inferentially, the present plaintiffs joined in the motions brought by the others. (See *Sherwood* v. *Superior Court* (1979) 24 Cal.3d 183, 186-187 [154 Cal.Rptr. 917, 593 P.2d 862]; Cal. Rules of Court, rule 56.)

defendants. Consequently, insofar as the present record permits, our pretrial review of these orders is consistent with standard 19.[4]

■ The orders under review apply to those cases and causes of action based on the doctrine of strict liability, which was established in California by the historic case of *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]. "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Id.,* at p. 62.) "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves" (*id.,* at p. 63; *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 133 [104 Cal.Rptr. 433, 501 P.2d 1153]), and "to relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 431 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]; *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 119 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036]; *Cronin, supra,* at p. 133.) "From its inception, however, strict liability has never been, and is not now, *absolute* liability. As has been repeatedly expressed, under strict liability the manufacturer does not thereby become the insurer of the safety of the product's user. [Citations.]" (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162].)

■ The concept of defects in a strict liability case encompasses design defects as well as manufacturing defects, and it is the concept of design defect within which the parties frame their issues and respective positions.[5] *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413 sets forth the tests for design defects in product liability cases: "[A] product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an

---

[4] In their requests to this court, as well as the Supreme Court, the parties asserted the necessity for *pretrial* review of the challenged orders, urging their inability to proceed expeditiously to trial without resolution of issues characterized as essential to the preparation and trial of all the affected cases. At oral argument we learned for the first time that many of the individual cases have been tried, others are currently in trial, and the remainder are routinely being set for trial. Neither party has requested a stay in any of the proceedings below, nor have they advised us why or how they have managed to try these matters in spite of the alleged necessity of pretrial review of the challenged orders.

[5] Products may also be found defective because of the lack or inadequacy of warnings or instructions. We discuss this in Part III, *infra.*

intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.,* at p. 432.)

The first *Barker* test is commonly referred to as the "consumer expectation" test, and the alternative as the "risk-benefit" test. The consumer expectation test "reflects a warranty analysis and is based on the theory that when a manufacturer places a product on the market, a representation is impliedly made that the product is safe for the tasks it was designed to accomplish. [Citation.]" (*Campbell* v. *General Motors Corp., supra,* 32 Cal.3d at p. 118.) "[I]f a plaintiff proceeds under the first prong of *Barker,* in addition to establishing a prima facie case regarding causation, the plaintiff must also produce evidence that the product failed to satisfy ordinary consumer expectations as to safety. [Citation.]" (*Id.,* at p. 126.)

Within these general parameters we commence our review.

I

Defendants challenge General Order 7.01, which states: "In any case in which plaintiff relies exclusively on the consumer expectation theory of liability as set forth in *Barker* v. *Lull [Engineering Co., supra,* ] 20 Cal.3d 413, (i.e. not upon the risk-benefit theory) and the issue of punitive damages is not before the jury, evidence as to state of the art is irrelevant and inadmissible. Similarly, in such a case, evidence of compliance with government specifications is irrelevant and inadmissible. In any case involving alleged exposure to asbestos by a plaintiff while on active military duty, evidence of compliance with government specifications may be admissible in support of a government contractor defense."

Defendants contend that *Barker's* consumer expectation theory of design defect cannot be utilized by any of the plaintiffs in these cases. In light of the record we can resolve this contention rather summarily. We assume that the hundreds of asbestos cases herein may involve numerous products and uses within a variety of industries and occupations under differing circumstances and conditions.[6] It is appellant's burden to demonstrate error by an

---

[6] Due to the fire resistant, insulative and reinforcing properties of asbestos, asbestos-bearing products were widely used in shipbuilding and repair and in the construction industry. Asbestos was used in such products as textiles, paper, ropes, wicks, stoves, filters, floor tiles, roofing shingles, clutch facings, water pipe, cement, fillers, felt, fireproof clothing, gaskets, battery boxes, clapboard, wallboard, fire doors, fire curtains, and brake lining. It was also

adequate record (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 418), and without an adequate record we must assume facts in support of the trial court's order. General Order 7.01 does not define the sort of case or factual situation to which the consumer expectation theory will apply, nor does it limit or mandate its application. Rather, it limits the sort of evidence which is admissible in those causes of action in which the plaintiff is entitled to and does rely solely upon such theory. However, defendants challenge plaintiffs' use of the consumer expectation theory under *any* and *all* circumstances. On the basis of this record, we cannot impose such broad prohibitions. A determination of the applicability of the consumer expectation theory requires more of a factual record than we possess.

Defendants also challenge that portion of General Order 7.01 which excludes "state of the art" evidence under the consumer expectation theory. Neither plaintiffs nor the record define the term "state of the art." It is not a legal term of art. As one observer has noted: "And what about 'state of the art'? 'State of the art' is a chameleon-like term, referring to everything from ordinary customs of the trade to the objective existence of technological information to economic feasibility. Its meanings are so diverse and so easily confused that the wise course of action, I think, is to eschew its use completely." (Wade, *On the Effect in Product Liability of Knowledge Unavailable Prior to Marketing* (1983) 58 N.Y.U. L.Rev. 734, 750-751, fn. omitted.) During oral argument we learned that the parties could not agree on a definition. In its memorandum of opinion in support of General Order 7.02 the trial court appears to have defined it as: facts which were either known or discoverable in light of the scientific and technological knowledge available to defendants at the time the products were produced and distributed. However, defendants' challenge to this facet of the order rests upon their asserted premise that the consumer expectation test is inapplicable to any and all cases below, and we have explained that the record before us is inadequate for review of this contention.

■■ In their final challenge to General Order 7.01 defendants maintain that the "government contractor defense" is equally available against nonmilitary plaintiffs. This defense has its origin in *Feres* v. *United States* (1950) 340 U.S. 135 [95 L.Ed. 152, 71 S.Ct. 153], which held that the United States "is not liable under the Federal Tort Claims Act [28 U.S.C.

---

used for fire resistant partitions in schools, office buildings, hospitals and ships, as thermal insulation on structural steelwork, as acoustical insulation for walls and ceilings, as undersealing for automobiles, and as insulation for air conditioning, ducts, shafts, steam lines, oil lines, and chemical lines. Asbestos was also used in ironing board covers, theatre scenery, hot air pipe wrapping, stove lining, table pads, handles and coatings of all sorts. (Sourcebook on Asbestos Diseases (Peters & Garland Publishing, Inc., 1980) ch. 1; see also, *Mullen* v. *Armstrong World Industries, Inc.* (1988) 200 Cal.App.3d 250, 256-257 [246 Cal.Rptr. 32]; *Case* v. *Fibreboard Corp.* (Okla. 1987) 743 P.2d 1062, 1065-1066.)

§ 2671 et seq.] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." (*Id.,* at p. 146 [95 L.Ed. at p. 161].) In *Stencel Aero Engineering Corp.* v. *U.S.* (1977) 431 U.S. 666 [52 L.Ed.2d 665, 97 S.Ct. 2054], the United States was also held immune under the Federal Tort Claims Act from indemnity claims by a private manufacturer of military equipment components who was liable for damages to a serviceman injured as a result of the manufacturer's negligence.

In *McKay* v. *Rockwell Intern. Corp.* (9th Cir. 1983) 704 F.2d 444, a divided Ninth Circuit held that private manufacturers or suppliers of military equipment are not liable to servicemen under the doctrine of strict liability "for a design defect where: (1) The United States is immune from liability under *Feres* and *Stencel,* (2) the supplier proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment, (3) the equipment conformed to those specifications, and (4) the supplier warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States." (*Id.,* at p. 451.)

In *McLaughlin* v. *Sikorsky Aircraft* (1983) 148 Cal.App.3d 203 [195 Cal.Rptr. 764] a divided Court of Appeal applied the *McKay* rule to state court actions by members of the armed forces against military equipment manufacturers.

Subsequent to the trial court's ruling, and while this proceeding was pending in this court, the United States Supreme Court decided *Boyle* v. *United Technologies Corporation* (1988) 487 U.S. 500 [101 L.Ed.2d 442, 108 S.Ct. 2510]. *Boyle* noted that in areas of " 'uniquely federal interests' " state law may be preempted or displaced by federal law, and that civil liability arising from the performance of a federal procurement contract is such an area. (*Id.,* at p. __ [101 L.Ed.2d at pp. 452-453, 108 S.Ct. at pp. 2513-2514].) *Boyle* then determined that preemption or displacement of state law would occur in an area of uniquely federal interest only where a "significant conflict" exists between an identifiable federal policy or interest and the operation of state law. *Boyle* concluded that "state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." (*Id.,* at p. __ [101 L.Ed.2d at p. 458, 108 S.Ct. at p. 2518].)

*Boyle* adopted the rule of the Ninth Circuit in *McKay* (and the Fourth Circuit in its resolution of *Boyle* below), and established the test which governs here: "Liability for design defects in military equipment cannot be

imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." (*Boyle* v. *United Technologies Corporation, supra,* 487 U.S. at p. __ [101 L.Ed.2d at p. 458, 108 S.Ct. at p. 2518].)

*Boyle* does not distinguish between military and nonmilitary parties. Rather, as we have indicated, its application focuses instead on whether the issue or area is one involving "uniquely federal interests" and, if so, whether the application of state law presents a "significant conflict" with federal policy.

As we noted earlier, we lack a sufficient factual basis for other than a general ruling. Consequently, insofar as General Order 7.01 rules generally that evidence of government specifications is irrelevant and inadmissible, it is in error. The admissibility of such evidence is governed by the *Boyle* standards.

## II

■ Defendants also challenge General Order 7.09, which states: "In any case in which plaintiff relies exclusively on the consumer expectation theory . . . evidence of conduct of plaintiff's employer or other third party as to cause of injury is irrelevant and inadmissible, unless defendant makes a *prima facie* showing to the trial judge, outside the presence of the jury, that such conduct was intentionally tortious, criminal, or so highly extraordinary as to be unforeseeable. [¶] A defendant may seek exemption from this ruling from the trial court in any case in which the defendant contends a warning was given by the defendant and not heeded by the plaintiff's employer or other intervening third party."

Defendants contend the trial court erred in not specifying that following a prima facie showing to the trial judge, it is for the jury (unless reasonable minds could not differ) to determine whether an employer or third party's conduct was foreseeable, and in conditioning defendants' exemption from the ruling only where the particular defendant gave a warning which was not heeded.

Our review of this order is again hampered by the absence of a record defining the particular product, the manner in which it was used, and the nature and extent of the employer's or third party's conduct. Thus, we review a general rule which is to be applied to a wide variety of circumstances. Insofar as the challenged order requires that preliminary facts be

determined outside the jury's presence, the trial court's ruling is well within its discretion. Evidence Code section 402 specifically authorizes such a procedure, and Evidence Code section 320 vests the trial court with discretion to regulate the order of proof. Absent a clear abuse of discretion, the trial court's rulings on such procedural matters will not be disturbed. (*Gherman* v. *Colburn* (1977) 72 Cal.App.3d 544, 584 [140 Cal.Rptr. 330].) We do not interpret the order as removing the resolution of factual issues from the jury. The clear import is to the contrary, and defendants' fears are unfounded. (See, e.g., *Southern Cal. Edison Co.* v. *Harnischfeger Corp.* (1981) 120 Cal.App.3d 842, 853 [175 Cal.Rptr. 67].)

■ However, to the extent the order limits defendants from proving the existence of concurrent causes of plaintiffs' losses, it is overly broad. The phrase "strict liability" is somewhat of a misnomer. The doctrine of strict liability, under California law, relieves the plaintiff from having to prove the defendant's negligence in appropriate cases (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at p. 431), but it does not eliminate the doctrine of concurrent or superseding causation. (*Southern Cal. Edison Co.* v. *Harnischfeger Corp., supra,* at p. 854; *Thompson* v. *Package Machinery Co.* (1971) 22 Cal.App.3d 188, 193-195 [99 Cal.Rptr. 281].) The liability of concurrent tortfeasors is not dependent upon intentional or criminal conduct—mere negligence, or their own "strict liability," is sufficient if their product or conduct proximately contributes to the loss. (See, e.g., *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 586-590 [146 Cal.Rptr. 182, 578 P.2d 899]; *Southern Cal. Edison Co.* v. *Harnischfeger Corp., supra,* at p. 854; *Thompson* v. *Package Machinery Co., supra,* at pp. 193-195.)

Consequently, in a case where concurrent or superseding causation is properly in issue, defendants should be permitted to prove such causation by evidence of the other tortfeasors' ordinary negligence or strict liability.

### III

Plaintiffs challenge General Order 7.02, which states: "Plaintiff's motion to exclude state of the art evidence in a case tried on a failure-to-warn theory of liability is denied." We noted in part I of this decision that we have not been provided with a definition of the phrase "state of the art" and that the parties are unable to agree on its meaning. We are proceeding on the trial court's apparent use of that phrase as: facts which were either known or discoverable in light of the scientific and technological knowledge available to defendants at the time the products were produced and distributed. In addition, the trial court also understood the issue to be whether a failure to warn subjects a manufacturer to strict liability as defined by

*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57 and *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413.

The record does not reveal whether the parties' concern is directed to a total absence of any sort of warning or notice, or to the adequacy of any given warning. (See, e.g., *Finn* v. *G.D. Searle & Co.* (1984) 35 Cal.3d 691, 699-700 [200 Cal.Rptr. 870, 677 P.2d 1147].)[7] Neither do we know whether defendants knew or should have known of the asserted danger, or whether they could not reasonably have known. We are not called upon to formulate a general rule or guideline for determining the circumstances under which a warning must, or need not, be given. Rather, we are again confronted with a general evidentiary ruling which is to be applied to the entire spectrum of products and uses which may conceivably arise among these hundreds of cases. (See fn. 6, *supra.*) However, this order is not exclusionary across the board—the ultimate decision is necessarily left to the trial court in each case. Hence, we should deny the petition unless plaintiffs can demonstrate that such evidence is not admissible under any circumstance.

■ It has generally been recognized that the failure to issue an adequate warning may subject manufacturers and distributors to strict liability when they knew or should have known of the danger and the necessity to warn. (See, e.g., *Campbell* v. *General Motors Corp., supra,* 32 Cal.3d at p. 120; *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at pp. 417-418; *Rosburg* v. *Minnesota Mining & Mfg. Co.* (1986) 181 Cal.App.3d 726, 734 [226 Cal.Rptr. 299]; *Blackwell* v. *Phelps Dodge Corp.* (1984) 157 Cal.App.3d 372, 377 [203 Cal.Rptr. 706]; *Lunghi* v. *Clark Equipment Co.* (1984) 153 Cal.App.3d 485, 493-494 [200 Cal.Rptr. 387]; *Burke* v. *Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768, 772 [150 Cal.Rptr. 419]; *Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 342-350 [157 Cal.Rptr. 142]; *Midgley* v. *S.S. Kresge Co.* (1976) 55 Cal.App.3d 67, 71-75 [127 Cal.Rptr. 217]; *Barth* v. *B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 244-245 [71 Cal.Rptr. 306]; *Casetta* v. *United States Rubber Co.* (1968) 260 Cal.App.2d 792, 816 [67 Cal.Rptr. 645]; *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 54-55 [46 Cal.Rptr. 552].)

The difficulty in applying strict liability to failure-to-warn cases arises when the danger was "unknowable" to the manufacturer or distributor—

---

[7] As our Supreme Court has noted, there are two basic types of warnings: "First, the manufacturer may be required adequately to instruct the consumer as to how the product should be used. . . . A second distinctive form of warning is that which informs a consumer . . . of potential risks or side effects which may follow the foreseeable use of the product." (*Finn* v. *G.D. Searle & Co., supra,* 35 Cal.3d at p. 699.) The first type of warning will enable the consumer to eliminate or reduce the risk; the second type will provide the opportunity to make an informed choice. (*Id.,* at p. 700.)

that is, when the state of scientific and technological knowledge during the relevant period was such that the manufacturer or distributor could not have known of the danger. At least one Court of Appeal has ruled that liability may not be imposed when the manufacturer or distributor could not have been aware of the danger. (*Oakes* v. *E.I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 650-651 [77 Cal.Rptr. 709].) In their briefs, the parties discuss only the unknowable dangers or defects, and we accordingly confine our discussion within the same parameters.

The Restatement takes the position that manufacturers and distributors should be subject to strict liability for failure to warn only "if [they have] knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of . . . the danger." (Rest.2d Torts, § 402A, comment j.) Most jurisdictions agree. (See cases collected in annotations: Strict Products Liability: Liability for Failure to Warn as Dependent on Defendant's Knowledge of Danger, 33 A.L.R.4th 368; Failure to Warn as Basis of Liability Under Doctrine of Strict Liability in Tort, 53 A.L.R.3d 239.) The manufacturer is, of course, held to the standard of an expert. (See *Christofferson* v. *Kaiser Foundation Hospitals* (1971) 15 Cal.App.3d 75 [92 Cal.Rptr. 825, 53 A.L.R.3d 292]; *Feldman* v. *Lederle Laboratories* (1984) 97 N.J. 429 [479 A.2d 374].)

Plaintiffs contend that since the doctrine of strict liability focuses on the product rather than the manufacturer's conduct (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at pp. 418, 432), the consideration of "state of the art" evidence improperly infuses concepts of negligence into a strict liability case, citing *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d 121. *Cronin* held it improper in a strict liability case to require the plaintiff to prove that the defective product is "unreasonably" dangerous to the consumer, since to do so would "burden . . . the injured plaintiff with proof of an element which rings of negligence." *Cronin,* however, did not involve or address the current issue, which is quite different. As other decisions and commentators have noted, "liability based upon a failure to warn adequately of dangers (Restatement (Second) of Torts sec. 402A, comment *j* (1965)) is itself a doctrine borrowed from negligence. [Citation.]" (*Woodill* v. *Parke Davis & Co.* (1986) 79 Ill.2d 26 [402 N.E.2d 194, 198]; *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 988 [95 Cal.Rptr. 381]; *Oakes* v. *E.I. Du Pont de Nemours & Co., Inc., supra,* 272 Cal.App.2d at p. 650, fn. 4.)

The California Supreme Court has not resolved this issue in a nondrug case, although it has noted diverse approaches in other jurisdictions: "one imposes strict liability for a failure to warn regardless of defendant's knowledge or ability to know of the side-effect-causing injury [citation], and one

focuses first on the manufacturer's actual or constructive knowledge. [Citations.]" (*Finn* v. *G.D. Searle & Co., supra,* 35 Cal.3d at p. 699.)

In *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049 [245 Cal.Rptr. 412, 751 P.2d 470] our Supreme Court addressed the issue in a prescription drug case and ruled that a drug manufacturer could not be held strictly liable for failure to warn of risks of which it could not have been aware. Writing for a unanimous court in *Brown,* Justice Mosk analyzed the application of strict liability principles to prescription drugs, and concluded that the manufacturer's liability for a defectively designed drug should not be measured by strict liability standards. Recognizing a distinction between prescription drugs and other products,[8] *Brown* relied upon comment k to section 402A of the Restatement Second of Torts, and the public interest in the development, availability, and reasonable price of drugs in rejecting the application of strict liability standards to injuries resulting from design defects in prescription drugs.

In the opening paragraph of its discussion of the failure-to-warn issue, *Brown* states: "For these same reasons of policy, we reject plaintiff's assertion that a drug manufacturer should be held strictly liable for failure-to-warn of risks inherent in a drug even though it neither knew nor could have known by the application of scientific knowledge available at the time of distribution that the drug could produce the undesirable side effects suffered by the plaintiff." (*Id.,* at p. 1065.) However, in its subsequent analysis of the failure-to-warn issue, the Supreme Court did not rely exclusively on the policy reasons it advanced in rejecting strict liability for design defects in prescription drugs.

---

[8] Comment k to section 402A of the Restatement Second of Torts, states: "*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

*Brown* also cited comment j, and noted that most jurisdictions condition liability for failure to warn on the manufacturer's actual or constructive knowledge at the time the product was distributed. In so ruling, *Brown* cited numerous cases which do not involve prescription drugs. (*Dimond* v. *Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173 [134 Cal.Rptr. 895]; *Bojorquez* v. *House of Toys, Inc.* (1976) 62 Cal.App.3d 930 [133 Cal.Rptr. 483, 95 A.L.R.3d 386]; *Dosier* v. *Wilcox-Crittendon Co.* (1975) 45 Cal.App.3d 74 [119 Cal.Rptr. 135]; *Barth* v. *B.F. Goodrich Tire Co., supra,* 265 Cal.App.2d 228; *Oakes* v. *E.I. Du Pont de Nemours & Co., Inc., supra,* 272 Cal.App.2d 645; *Canifax* v. *Hercules Powder Co., supra,* 237 Cal.App.2d 44.) *Brown* also noted that the imposition of strict liability on a manufacturer for failure to warn of a risk which was not only unknown, but scientifically and technologically undiscoverable, was tantamount to making the manufacturer an insurer, a principle contrary to the tenets of the strict liability doctrine. (See *Daly* v. *General Motors Corp., supra,* 20 Cal.3d at p. 733.) We therefore do not interpret *Brown*'s analysis of the failure to warn issue to necessarily be limited to prescription drug cases. The same rationale applies equally to other products.

Based on the foregoing, we conclude that manufacturers may not be held strictly liable for failure to warn of risks of which they were unaware and could not have been aware by the reasonable application of scientific knowledge available at the time of distribution. Consequently, "state of the art" evidence may well be relevant and admissible in a failure to warn case, and the order should be affirmed.

As to General Order 7.02 the petition is denied. As to General Orders 7.01 and 7.09, let a peremptory writ issue commanding respondent superior court to vacate and set aside such orders and to enter new orders not inconsistent with this decision.

Low, P. J., and King, J., concurred.

## APPENDIX A

### Sec. 19. Complex litigation

(a) [Judicial management] In complex litigation, judicial management should begin early and be applied continuously and actively, based on knowledge of the circumstances of each case.

(b) [Hearing] The court may on its own motion examine the question whether litigation is complex or may do so on the motion of any party, but no determination of complexity should be made without a hearing on the issue.

(c) [Definition] "Complex litigation" means those cases that require specialized management to avoid placing unnecessary burdens on the court or the litigants. Complex litigation is not capable of precise definition but may involve, for example, multiple related cases, extensive pretrial activity, extended trial times, difficult or novel issues, and postjudgment judicial supervision, or may concern special categories such as class actions; however, no particular criterion is controlling and each situation must be examined separately.

(d) [All-purpose assignment] Complex litigation should be assigned to one judge for all purposes. If such an assignment is not possible, a single judge should be assigned to hear law and motion and discovery matters.

(e) [Selection of judges for complex litigation assignments] There should not be a special panel of judges for complex litigation assignments, but judges available for such assignments should have a background, temperament, and interests indicating an ability to exercise firm and efficient controls. Commissioners should not be employed in any phase of complex litigation, except under the judge's direct supervision to assist in the management of the case.

(f) [Establishing time limits] Time limits should be regularly used to expedite major phases of complex litigation. Time limits should be established early, tailored to the circumstances of each case, firmly and fairly maintained, and accompanied by other methods of sound judicial management.

(g) [Preliminary trial conference—subjects for consideration] A preliminary trial conference with all parties represented should be conducted at the earliest practical date. Among the subjects that might be considered at such a conference are:

(1) Settle the pleadings

(2) Determine whether severance, consolidation, or coordination with other actions is desirable

(3) Schedule discovery proceedings

(4) Issue protective orders

(5) Arrange settlement conferences

(6) Appoint liaison counsel

(7) Provide for exchange of documents

(8) Require a list of deponents and a statement of the general purpose of the depositions

(9) Open a judge's working file

(10) Organize a master list of mail addresses and telephone numbers of counsel

(11) Schedule further conferences as necessary

(h) [Objects of conference] Principal objects of the preliminary pretrial conference are to expose at an early date the essential issues in the litigation and to suppress unnecessary and burdensome discovery procedures in the course of preparing for trial of those issues.

(i) [Preparation for trial] Litigants in complex litigation cases should be required to minimize evidentiary disputes and to organize efficiently their exhibits and other evidence prior to trial.

(j) [Dilatory tactics] Judges involved in complex litigation should be sensitive to dilatory or abusive litigation tactics and should be prepared to invoke disciplinary procedures for violations.

(k) [Educational programs] Judges should be encouraged to attend educational programs on the management of complex litigation. Judges actually assigned to this litigation should be given extra staff assistance where possible.

Adopted, eff. July 1, 1982.